Filed 11/29/12

# IN THE SUPREME COURT OF CALIFORNIA

PACIFIC PALISADES BOWL MOBILE )
ESTATES, LLC, )
                                          )
        Plaintiff and Appellant, )
                                            )         S187243
        v. )
                                            )     Ct.App. 2/4 B216515
CITY OF LOS ANGELES, )
                                            )     Los Angeles County
        Defendant and Appellant. )    Super. Ct. No. BS112956
_____)

       We hold here that the requirements of the California Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq.; hereafter Coastal Act) and the Mello Act (Gov. Code, §§ 65590, 65590.1) apply to a proposed conversion, within California's coastal zone, of a mobilehome park from tenant occupancy to resident ownership. In so holding, we reject the argument that such a conversion is not a "development" for purposes of the Coastal Act, and further reject the argument that Government Code section 66427.5, a provision of the Subdivision Map Act (Gov. Code, §§ 66410-66499.37), exempts such conversions from the need to comply with other state laws, or precludes local governmental agencies from exercising state-delegated authority to require compliance with state laws such as the Coastal Act or the Mello Act.

       We therefore affirm the Court of Appeal's judgment overturning a grant of mandamus relief to Pacific Palisades Bowl Mobile Estates, LLC (Palisades Bowl).

1

## BACKGROUND

The present controversy arose after the City of Los Angeles (the City) refused to accept Palisades Bowl's application to convert its 170-unit mobilehome park from tenant occupancy to resident ownership because Palisades Bowl had failed to include applications for a coastal development permit or for Mello Act approval. Palisades Bowl declined to provide the applications, instead filing in the superior court a petition for writ of mandate and a complaint for injunctive and declaratory relief. Palisades Bowl argued that the proposed conversion was not a development subject to the Coastal Act, and that the City's action was in any event barred by Government Code section 66427.5, a provision that states substantive and procedural requirements for obtaining map approval for conversions of mobilehome parks from tenant occupancy to resident ownership. The trial court agreed with Palisades Bowl. It therefore issued a peremptory writ of mandamus commanding the City to vacate its decision finding Palisades Bowl's application incomplete, to deem the application complete, and to evaluate the application for approval without considering whether it complied with either the Coastal Act or the Mello Act.

The Court of Appeal reversed, reasoning that the policy considerations behind the Coastal Act and the Mello Act are more extensive than those behind Government Code section 66427.5, and section 66427.5 therefore could not preclude the City from imposing conditions and requirements mandated by those acts on a subdivider seeking to convert to resident ownership a mobilehome park located in the coastal zone. It therefore entered judgment directing the trial court to vacate its peremptory writ of mandamus and enter judgment in favor of the City. We granted review.

2

# DISCUSSION

## I.

We are concerned with the interplay between three separate statutory schemes, each furthering important state interests and each in some manner regulating development within California's coastal areas.

### A. *Coastal Act (Pub. Resources Code, § 30000 et seq.)*

The Coastal Act "was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California. The Legislature found that 'the California coastal zone is a distinct and valuable natural resource of vital and enduring interest to all the people'; that 'the permanent protection of the state's natural and scenic resources is a paramount concern'; that 'it is necessary to protect the ecological balance of the coastal zone' and that 'existing developed uses, and future developments that are carefully planned and developed consistent with the policies of this division, are essential to the economic and social well-being of the people of this state . . . .' ([Pub. Resources Code,] § 30001, subds. (a) and (d).)" (*Yost v. Thomas* (1984) 36 Cal.3d 561, 565.) The Coastal Act is to be "liberally construed to accomplish its purposes and objectives." (Pub. Resources Code, § 30009.) Under it, with exceptions not applicable here, any person wishing to perform or undertake any development in the coastal zone must obtain a coastal development permit "in addition to obtaining any other permit required by law from any local government or from any state, regional, or local agency . . . ." (*Id*., § 30600, subd. (a).)

The Coastal Act expressly recognizes the need to "rely heavily" on local government "[t]o achieve maximum responsiveness to local conditions, accountability, and public accessibility . . . ." (Pub. Resources Code, § 30004, subd. (a).) As relevant here, it requires local governments to develop local coastal programs, comprised of a land use plan and a set of implementing ordinances

3

designed to promote the act's objectives of protecting the coastline and its resources and of maximizing public access. (*Id.*, §§ 30001.5, 30500-30526; *Landgate, Inc. v. California Coastal Com.* (1998) 17 Cal.4th 1006, 1011.) Once the California Coastal Commission certifies a local government's program, and all implementing actions become effective, the commission delegates authority over coastal development permits to the local government. (Pub. Resources Code, §§ 30519, subd. (a), 30600.5, subds. (a), (b), (c).) Moreover, "[p]rior to certification of its local coastal program, a local government may, with respect to any development within its area of jurisdiction, . . . establish procedures for the filing, processing, review, modification, approval, or denial of a coastal development permit." (*Id.*, § 30600, subd. (b)(1).) An action taken under a locally issued permit is appealable to the commission. (*Id.*, § 30603.) Thus, "[u]nder the Coastal Act's legislative scheme, . . . the [local coastal program] and the development permits issued by local agencies pursuant to the Coastal Act are not solely a matter of local law, but embody state policy." (*Charles A. Pratt Construction Co., Inc. v. California Coastal Com.* (2008) 162 Cal.App.4th 1068, 1075.) "In fact, a fundamental purpose of the Coastal Act is to ensure that state policies prevail over the concerns of local government." (*Ibid.*) Moreover, in certain areas, sometimes referred to as dual permit jurisdictions, an applicant must obtain a permit from the local entity and after obtaining the local permit, a second permit from the commission. (Pub. Resources Code, §§ 30600, 30601; Cal. Code Regs., tit. 14, § 13301, subd. (a).) Palisades Bowl's mobilehome park is located in a dual permit jurisdiction.

The Coastal Act does not specifically recite that it requires a permit for mobilehome park conversions, and Palisades Bowl contends it does not. We disagree. The act requires a coastal development permit for "any development" in the coastal zone. (Pub. Resources Code § 30600.) As relevant here, a

4

"development" means a "change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act . . . , and any other division of land, including lot splits, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use." (*Id*., § 30106.) The Subdivision Map Act defines "subdivision" as "the division, by any subdivider, of any unit or units of improved or unimproved land, or any portion thereof . . . ." (Gov. Code, § 66424.) It specifically refers to the conversion of a rental mobilehome park to resident ownership as a form of "subdivision" (*id*., § 66427.5), and refers to the applicant seeking to subdivide the property on which the park is located as the "subdivider" (*id.*, §§ 66423, 66427.4, 66427.5). A mobilehome park conversion thus is a "subdivision" under the Subdivision Map Act and for that reason is also a "development" subject to the Coastal Act's permit requirements.

Palisades Bowl argues, however, a conversion of a mobilehome park is not a "development" for purposes of the Coastal Act because it does not alter the density or intensity of use of the land. But by introducing a list of projects, including "subdivision," with the phrase "including, but not limited to," the Legislature in Public Resources Code section 30106 has explained that each listed project *is* a change in the intensity of use for purposes of the act, and by means of the list illustrates various species of changes in land use against which other unspecified projects may be measured so it may be determined whether they, too, require coastal permits. (See *People v. Arias* (2008) 45 Cal.4th 169, 181 [recognizing "the proviso 'including, but not limited to' 'connotes an illustrative listing, one purposefully capable of enlargement' "].) *Any* subdivision under the Subdivision Map Act thus is, *by definition*, a species of change in the density or intensity of use of land and is a "development." Palisades Bowl also seems to assume the Coastal Act is concerned only with preventing an *increase* in density

5

or intensity of use, but Public Resources Code section 30106, by using the word "change," signals that a project that would *decrease* intensity of use, such as by limiting public access to the coastline or reducing the number of lots available for residential purposes, is also a development. We observe, further, that other portions of Public Resources Code section 30106 define "development" to include uses that may not or will not have any effect on the density or intensity of use.[1] In addition, the statutory reference to "other division[s] of land, including lot splits" (Pub. Resources Code, § 30106), which need not result in a change in density or intensity of use, further suggests the Legislature intended "development" to include all listed uses *and* all changes in density or intensity of use whether or not the specific use was among those listed.

---

[1] Public Resources Code section 30106 recites in full: " 'Development' means, on land, in or under water, the placement or erection of any solid material or structure; discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; grading, removing, dredging, mining, or extraction of any materials; change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act (commencing with Section 66410 of the Government Code), and any other division of land, including lot splits, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use; change in the intensity of use of water, or of access thereto; construction, reconstruction, demolition, or alteration of the size of any structure, including any facility of any private, public, or municipal utility; and the removal or harvesting of major vegetation other than for agricultural purposes, kelp harvesting, and timber operations which are in accordance with a timber harvesting plan submitted pursuant to the provisions of the Z'berg-Nejedly Forest Practice Act of 1973 (commencing with Section 4511).

"As used in this section, 'structure' includes, but is not limited to, any building, road, pipe, flume, conduit, siphon, aqueduct, telephone line, and electrical power transmission and distribution line."

An expansive interpretation of "development" is consistent with the mandate that the Coastal Act is to be "liberally construed to accomplish its purposes and objectives." (Pub. Resources Code, § 30009.) It thus has been held that "development" is not restricted to physical alteration of the land. (*DeCicco v. California Coastal Com.* (2011) 199 Cal.App.4th 947, 951 [Rejecting a claim that a subdivision is not a land use and explaining, "[a]lthough a subdivision may not be a use of land, it is quite clearly a 'development' within the meaning of the Coastal Act. Section 30106 expressly defines 'development' to include 'subdivision.' "].) Similarly, it has been recognized that the Coastal Act's definition of "development" goes beyond "what is commonly regarded as a development of real property" (*Gualala Festivals Committee v. California Coastal Com.* (2010) 183 Cal.App.4th 60, 67) and is not restricted to activities that physically alter the land or water (*id*. at p. 68).

That the act extends to conversions is further demonstrated by Public Resources Code section 30610, which exempts specified projects, including conversion of a multiple-unit residential structure to a time-share project, from the coastal permit requirement. Subdivision (h) of section 30610 explains that the conversion of a residential structure into condominiums is not a time-share project and thus does not qualify for this exemption. If the conversion of a residential structure into condominiums were not a "development" because it does not increase the density or intensity of use, the explanation would be unnecessary.

Finally, the Legislature laid to rest any argument that conversions from tenant occupancy to resident ownership are not subject to the provisions of the Coastal Act by its response to a trial court's ruling that a stock cooperative conversion was not subject to the act because it was not a "development." At the time of the trial court's ruling, Government Code section 66424, which generally

7

lists the projects defined as "subdivisions" under the Subdivision Map Act, did not expressly refer to stock cooperative conversions. The trial court, reasoning a stock cooperative conversion was neither a defined "subdivision" nor a division of land, concluded it could not be a "development" for purposes of the Coastal Act. (*California Coastal Com. v. Quanta Investment Corp.* (1980) 113 Cal.App.3d 579, 595.) The Legislature responded by amending Government Code section 66424 to specifically recite " 'Subdivision', includes . . . the conversion of five or more existing dwelling units to a stock cooperative . . ." (Gov. Code, § 66424, as amended by Stats. 1979, ch. 1192, § 1, pp. 4691-4692; *Quanta*, at pp. 600-605 [quoting statute]), thus ensuring that stock cooperative conversions would be defined subdivisions and therefore would also be "developments" subject to the Coastal Act.

In short, *all* subdivisions, including mobilehome park conversions, are "developments" for purposes of the Coastal Act.

We also reject the notion that an owner seeking to convert a mobilehome park to resident ownership can avoid the reach of the Coastal Act by asserting that its particular conversion will have no impact on the density or intensity of land use. In the first place, that a conversion might not immediately alter use of land does not preclude the possibility it will lead to an increase in the density or intensity of use. Additionally, a conversion might lead to problematic design features as owners express their individuality by decorating or adding to their mobile homes. Nor is it impossible that owners would block public access to coastal areas or increase the number of residents in their units. In any event, the act accounts for the possibility a proposed project may not affect coastal resources by conferring authority on the executive director of the coastal commission, after a public hearing, to issue "waivers from coastal development permit requirements for any development that is de minimus." (Pub. Resources Code, § 30624.7.) As

8

explained in *Gualala Festivals Committee v. California Coastal Com.*, *supra*, 183 Cal.App.4th at pages 69-70: "Construing the Act to provide the Commission with both expansive jurisdiction to control even limited . . . development and the authority to exempt from the permit process development that does not have 'any *significant* adverse impact upon coastal resources' provides the Commission the necessary flexibility to manage the coastal zone environment so as to accomplish the statutory purposes." That a project specifically recognized as a "development" by the act is unlikely to affect density or intensity of land use may warrant a grant of exemption from the act's permit requirements, but it does not except the project from the act's jurisdiction.

We conclude the Coastal Act applies to all mobilehome park conversions to resident ownership.

## B. *The Mello Act (Gov. Code, §§ 65590, 65590.1)*

The Legislature, as part of the housing elements law (Gov. Code, §§ 65580-65589.8), has declared that the "availability of housing is of vital statewide importance," and "decent housing and a suitable living environment for every Californian . . . is a priority of the highest order." (*Id.*, § 65580, subd. (a).) Further, "[t]he provision of housing affordable to low- and moderate-income households requires the cooperation of all levels of government." (*Id.*, subd. (c).) Each local government therefore is required to adopt a "housing element" as a component of its general plan. (*Id.*, § 65581, subd. (b).) The housing element "shall consist of an identification and analysis of existing and projected housing needs and a statement of goals, policies, quantified objectives, financial resources, and scheduled programs for the preservation, improvement, and development of housing. The housing element shall identify adequate sites for housing, including rental housing, factory-built housing, mobilehomes, and emergency shelters, and

9

shall make adequate provision for the existing and projected needs of all economic segments of the community." (*Id.*, § 65583.)

The Mello Act supplements the housing elements law, establishing minimum requirements for housing within the coastal zone for persons and families of low or moderate income. (Gov. Code, § 65590, subds. (b), (k); *Venice Town Council, Inc. v. City of Los Angeles* (1996) 47 Cal.App.4th 1547, 1552-1553.) It does not require local governments to adopt individual ordinances or programs to ensure compliance with its provisions (Gov. Code, § 65590, subd. (h)(3)), but it prohibits local governments from authorizing "[t]he conversion or demolition of existing residential dwelling units occupied by persons and families of low or moderate income, . . . unless provision has been made for the replacement of those dwelling units with units for persons and families of low or moderate income." (*Id.*, subd. (b); *Venice Town Council, Inc.*, at p. 1553.)

The Mello Act expressly applies to most conversions of residential units within the coastal zone, and also expressly applies to the conversion of a mobilehome or mobilehome lot to a condominium, cooperative, or similar form of ownership. (Gov. Code, § 65590, subds. (b), (g)(1).)

**C. *The Subdivision Map Act (Gov. Code, §§ 66410-66499.37)***

"The Subdivision Map Act is 'the primary regulatory control' governing the subdivision of real property in California." (*Gardner v. County of Sonoma* (2003) 29 Cal.4th 990, 996.) It has three principal goals: "to encourage orderly community development, to prevent undue burdens on the public, and to protect individual real estate buyers." (*van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 563-564.) It "seeks 'to encourage and facilitate orderly community development, coordinate planning with the community pattern established by local authorities, and assure proper improvements are made, so that

10

the area does not become an undue burden on the taxpayer.' " (*Gardner*, at pp. 997-998.)

To accomplish its goals, the Subdivision Map Act sets suitability, design, improvement, and procedural requirements (e.g., Gov. Code, §§ 66473 et seq., 66478.1 et seq.). It also allows local governments to impose supplemental requirements of the same kind (e.g., *id.*, §§ 66475 et seq., 66479 et. seq.). (*The Pines v. City of Santa Monica* (1981) 29 Cal.3d 656, 659.) Further, "[t]he Act vests the '[r]egulation and control of the design and improvement of subdivisions' in the legislative bodies of local agencies, which must promulgate ordinances on the subject." (*Gardner v. County of Sonoma*, *supra*, 29 Cal.4th at p. 997, fn. omitted.) The local entity's enforcement power is directly tied to its power to grant or withhold approval of a subdivision map. Thus, "[o]rdinarily, subdivision under the Act may be lawfully accomplished only by obtaining local approval and recordation of a tentative and final map pursuant to section 66426, when five or more parcels are involved, or a parcel map pursuant to section 66428 when four or fewer parcels are involved." (*Ibid.*)

The subdivision process begins with submission to the city or county of an application, including a map depicting the proposed lots. The application and map are first reviewed for completeness. They are next reviewed for technical feasibility, which may require consultation with other agencies. (Dittman, *Map Quest: The Subdivision Map Act may be the most heavily litigated statute in land use law* (Jan. 2007) 29 L.A. Law. 23, 24-25.) The process typically involves one or more hearings. Thus, "[g]enerally, a public hearing is scheduled and conducted only after city and county staff have deemed the map complete, approved the technical feasibility of the map, and prepared an appropriate environmental analysis. The public hearing may be before an advisory agency that is authorized to approve, conditionally approve, or disapprove tentative maps . . . . After the

11

required public hearing or hearings, the tentative map can be approved." (*Id.* at p. 25, citing Gov. Code, §§ 66452.1, subds. (a), (b), 66452.2, subd. (b); see also *Horn v. County of Ventura* (1979) 24 Cal.3d 605, 616.)

The Subdivision Map Act cites a number of circumstances that require denial of a map; most relate to whether the proposed project and its design are appropriate to the community or to the site, the project's impact on the environment, or issues of health and safety.[2]

The Subdivision Map Act expressly applies to mobilehome park conversions. (Gov. Code, §§ 66427.4, 66427.5, 66428.1.)

---

[2] Government Code section 66474 recites that "A legislative body of a city or county shall deny approval of a tentative map, or a parcel map for which a tentative map was not required, if it makes any of the following findings:

"(a) That the proposed map is not consistent with applicable general and specific plans . . . .

"(b) That the design or improvement of the proposed subdivision is not consistent with applicable general and specific plans.

"(c) That the site is not physically suitable for the type of development.

"(d) That the site is not physically suitable for the proposed density of development.

"(e) That the design of the subdivision or the proposed improvements are likely to cause substantial environmental damage or substantially and avoidably injure fish or wildlife or their habitat.

"(f) That the design of the subdivision or type of improvements is likely to cause serious public health problems.

"(g) That the design of the subdivision or the type of improvements will conflict with easements, acquired by the public at large, for access through or use of, property within the proposed subdivision. In this connection, the governing body may approve a map if it finds that alternate easements, for access or for use, will be provided, and that these will be substantially equivalent to ones previously acquired by the public. This subsection shall apply only to easements of record or to easements established by judgment of a court of competent jurisdiction and no authority is hereby granted to a legislative body to determine that the public at large has acquired easements for access through or use of property within the proposed subdivision."

12

## II.

Palisades Bowl does not dispute that, as a general rule, developments within the coastal zone are subject not only to the provisions of the Subdivision Map Act (Gov. Code, §§ 66410-66499.37), but also to all other applicable state laws, including the Coastal Act (Pub. Resources Code, § 30000 et seq.) and the Mello Act (Gov. Code, §§ 65590, 65590.1). Nor does it dispute that, as a general rule, a local agency may or must reject an application that does not comply with the Coastal Act or the Mello Act, even if the application satisfies the requirements of the Subdivision Map Act. In this case, for example, Palisades Bowl sought a vesting tentative map. The approval of a vesting tentative map confers a vested right to proceed with the development in substantial compliance with the ordinances, policies, and standards described by the Subdivision Map Act. (Gov. Code, § 66498.1, subd. (b).) But a local agency may condition or deny a permit if "[t]he condition or denial is required in order to comply with state or federal law." (*Id*., subd. (c)(2).) Further, nothing in the chapter on vesting tentative maps "removes, diminishes, or affects the obligation of any subdivider to comply with the conditions and requirements of any state or federal laws, regulations, or policies and [the chapter] does not grant local agencies the option to disregard any state or federal laws, regulations, or policies." (*Id.*, § 66498.6, subd. (b).)[3]

---

[3] Palisades Bowl at times argues or suggests the City acted improperly, procedurally, by requiring it to file applications for a coastal permit and Mello Act clearance in connection with its application for a tentative map. But a combined application appears to be authorized by Public Resources Code section 30600, subdivision (b)(1), which authorizes local governments to "establish procedures for the filing, processing, review, modification, approval, or denial of a coastal development permit," and specifies that "[t]hose procedures may be incorporated and made a part of the procedures relating to any other appropriate land use development permit issued by local government." In addition, Government Code section 66498.1, subdivision (c)(2), part of the Subdivision Map Act, by

*(footnote continued on next page)*

13

But Palisades Bowl contends Government Code section 66427.5, a provision of the Subdivision Map Act, exempts mobilehome park conversions to resident ownership from other state laws, regulations, or policies, and prohibits local governmental entities from enforcing compliance with any state law requirements except for those imposed by the section itself.

Government Code section 66427.5 creates a mandatory procedure to "avoid the economic displacement of all nonpurchasing residents."  Under it, the subdivider must (1) offer each existing tenant the option to purchase that tenant's unit or to continue residency as a tenant (*id.*, subd. (a)), (2) file a report on the impact of the conversion project upon residents (*id.*, subd. (b)), (3) make a copy of the report available to residents at least 15 days prior to the advisory agency's hearing on the map (*id.*, subd. (c)), and (4) obtain a survey of the residents' support for the proposed conversion (*id.*, subd. (d)(1)).  Subdivision (d)(5) of section 66427.5 recites that the results of the survey "shall be submitted to the local agency upon the filing of the tentative or parcel map, to be considered as part of the subdivision map hearing prescribed by subdivision (e)."  Subdivision (e) recites:  "The subdivider shall be subject to a hearing by a legislative body or advisory agency, which is authorized by local ordinance to approve, conditionally approve, or disapprove the map. *The scope of the hearing shall be limited to the issue of compliance with this section.*"  (Italics added.)  Subdivision (f) states a formula and timeline for increasing the rent of nonpurchasing residents to the

---

*(footnote continued from previous page)*

conferring authority on local governmental agencies to deny or condition a permit to ensure compliance with state law, necessarily contemplates a showing of compliance with state law before or as part of the map application process.

market rate and limits the increases that may be charged lower-income

nonpurchasing residents.[4]

---

[4]     Government Code section 66427.5 recites in full:  "At the time of filing a tentative or parcel map for a subdivision to be created from the conversion of a rental mobilehome park to resident ownership, the subdivider shall avoid the economic displacement of all nonpurchasing residents in the following manner:

"(a) The subdivider shall offer each existing tenant an option to either purchase his or her condominium or subdivided unit, which is to be created by the conversion of the park to resident ownership, or to continue residency as a tenant.

"(b) The subdivider shall file a report on the impact of the conversion upon residents of the mobilehome park to be converted to resident owned subdivided interest.

"(c) The subdivider shall make a copy of the report available to each resident of the mobilehome park at least 15 days prior to the hearing on the map by the advisory agency or, if there is no advisory agency, by the legislative body.

"(d)(1) The subdivider shall obtain a survey of support of residents of the mobilehome park for the proposed conversion.

"(2) The survey of support shall be conducted in accordance with an agreement between the subdivider and a resident homeowners' association, if any, that is independent of the subdivider or mobilehome park owner.

"(3) The survey shall be obtained pursuant to a written ballot.

"(4) The survey shall be conducted so that each occupied mobilehome space has one vote.

"(5) The results of the survey shall be submitted to the local agency upon the filing of the tentative or parcel map, to be considered as part of the subdivision map hearing prescribed by subdivision (e).

"(e) The subdivider shall be subject to a hearing by a legislative body or advisory agency, which is authorized by local ordinance to approve, conditionally approve, or disapprove the map. The scope of the hearing shall be limited to the issue of compliance with this section.

"(f) The subdivider shall be required to avoid the economic displacement of all nonpurchasing residents in accordance with the following:

"(1) As to nonpurchasing residents who are not lower income households, as defined in Section 50079.5 of the Health and Safety Code, the monthly rent, including any applicable fees or charges for use of any preconversion amenities, may increase from the preconversion rent to market levels, as defined in an appraisal conducted in accordance with nationally recognized professional appraisal standards, in equal annual increases over a four-year period.

*(footnote continued on next page)*

In Palisades Bowl's view, by limiting the scope of the hearing prescribed by Government Code section 66427.5, subdivision (e) to the issue of compliance with "this section," the Legislature defined the full extent of a local governmental entity's obligation and power to review an application to convert a mobilehome park to resident ownership. Thus, according to Palisades Bowl, the City lacked authority to deny its application for the failure to comply with the Coastal Act or the Mello Act and for that reason also lacked authority to reject its application for failing to include applications for a coastal development permit and for Mello Act clearance. The City asserts, to the contrary, that Government Code section 66427.5, even if read to limit local regulation of mobilehome park conversions, need not and should not be construed to prevent local agencies from enforcing compliance with state laws such as the Coastal Act or the Mello Act.

As we are concerned here only with the application of Coastal Act and Mello Act requirements, we need not also determine whether Government Code section 66427.5 limits local regulation of mobilehome park conversions. We find that irrespective of any effect section 66427.5 has on local regulation of mobilehome park conversions or on the number or subject matter of any hearings required or permitted by the Subdivision Map Act, it does not affect the responsibility of local governmental agencies to ensure compliance with the

*(footnote continued from previous page)*

"(2) As to nonpurchasing residents who are lower income households, as defined in Section 50079.5 of the Health and Safety Code, the monthly rent, including any applicable fees or charges for use of any preconversion amenities, may increase from the preconversion rent by an amount equal to the average monthly increase in rent in the four years immediately preceding the conversion, except that in no event shall the monthly rent be increased by an amount greater than the average monthly percentage increase in the Consumer Price Index for the most recently reported period."

16

Coastal Act and the Mello Act and does not deprive local agencies of the power to hold hearings or impose such conditions as are necessary to ensure compliance with those acts.

**III.**

" 'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.' " (*In re C.H.* (2011) 53 Cal.4th 94, 100.) " 'If the statute's text evinces an unmistakable plain meaning, we need go no further.' " (*Ibid.*) But where, as here, a statute's terms are unclear or ambiguous, "we may 'look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' " (*In re M.M.* (2012) 54 Cal.4th 530, 536.)

Significant state policies favor an interpretation of Government Code section 66427.5 that does not deprive the Coastal Act and the Mello Act of jurisdiction over land use within the coastal zone. As we observed earlier, the Coastal Act specifically recites that "existing developed uses, and future developments that are carefully planned and developed consistent with the policies of [the act] are essential to the economic and social well-being of the people of this state . . . ." (Pub. Resources Code, § 30001, subd. (d).) Moreover, as the Court of Appeal recognized, the Coastal Act explains that the "permanent protection of the state's natural and scenic resources is a *paramount* concern to present and future residents of the state and nation." (Pub. Resources Code, § 30001, subd. (b), italics added.) The housing elements law, which the Mello Act supplements, similarly responds to a concern "of vital statewide importance." (Gov. Code, § 65580, subd. (a).)

17

Palisades Bowl, however, claims a different state policy mandates its interpretation of Government Code section 66427.5.  That section was enacted in 1991 (Stats. 1991, ch. 745, § 2, p. 3324), several years after the Legislature enacted the Mobilehome Park Resident Ownership Program (Health & Saf. Code, §§ 50780 et seq., 50781, subd. (j), added by Stats. 1984, ch. 1692, § 2, pp. 6115-6119; hereafter MPROP), in which it articulated its concern that manufactured housing and mobilehome parks, a significant source of affordable housing for California residents, were being threatened by increases in costs, physical deterioration, and pressures to convert the parks to other uses.  (Health & Saf. Code, § 50780, subd. (a).)  The MPROP was enacted "to encourage and facilitate the conversion of mobilehome parks to resident ownership or ownership by qualified nonprofit housing sponsors or by local public entities, to protect low-income mobilehome park residents from both physical and economic displacement, to obtain a high level of private and other public financing for mobilehome park conversions, and to help establish acceptance for resident-owned, nonprofit-owned, and government-owned mobilehome parks in the private market."  (Health & Saf. Code, § 50780, subd. (b).)[5]

_____

[5]     Health and Safety Code section 50780 provides in full:  "(a) The Legislature finds and declares as follows:

"(1) That manufactured housing and mobilehome parks provide a significant source of homeownership for California residents, but increasing costs of mobilehome park development and construction, combined with the costs of manufactured housing, the costs of financing and operating these parks, the low vacancy rates, and the pressures to convert mobilehome parks to other uses increasingly render mobilehome park living unaffordable, particularly to those residents most in need of affordable housing.

"(2) That state government can play an important role in addressing the problems confronted by mobilehome park residents by providing supplemental financing that makes it possible for mobilehome park residents to acquire the mobilehome parks in which they reside and convert them to resident ownership.

*(footnote continued on next page)*

18

In Palisades Bowl's view, it follows that when the Legislature enacted Government Code section 66427.5, it did so not only to provide a uniform statewide procedure for protecting nonpurchasing residents against economic displacement, but also to promote conversions of mobilehome parks to resident or nonprofit ownership by simplifying the procedures for what it asserts is little more than a change in title. (See also *Sequoia Park Associates v. County of Sonoma* (2009) 176 Cal.App.4th 1270, 1295 [taking the view that because tenant-occupied mobilehome parks are subject to a myriad of laws and regulations, local review of mobilehome park conversions is unnecessary].)

We do not agree. Although the MPROP reflects a state policy favoring conversions of mobilehome parks to resident ownership, nothing in it, and nothing in Government Code section 66427.5, suggests a belief by the Legislature that this policy is of more importance than and overrides the "paramount" and "vital"

---

*(footnote continued from previous page)*

"(3) That a significant number of older mobilehome parks exist in California, the residents of which may collectively lack the experience or other qualifications necessary to successfully own and operate their parks; that these parks provide low-cost housing for their residents that would be difficult to replace if the parks were converted to other uses; that these parks are more likely than other parks to be threatened by physical deterioration or conversion to other uses; and that it is, therefore, appropriate to use the resources of the fund pursuant to this chapter to transfer these parks to ownership by qualified nonprofit housing sponsors or by local public entities for the purpose of preserving them as affordable housing.

"(b) Therefore, it is the intent of the Legislature, in enacting this chapter, to encourage and facilitate the conversion of mobilehome parks to resident ownership or ownership by qualified nonprofit housing sponsors or by local public entities, to protect low-income mobilehome park residents from both physical and economic displacement, to obtain a high level of private and other public financing for mobilehome park conversions, and to help establish acceptance for resident-owned, nonprofit-owned, and government-owned mobilehome parks in the private market."

19

concerns of the Coastal Act and the Mello Act. In addition, the Subdivision Map Act's deference to other state or federal laws, regulations, or policies; the other interests at stake; and the absence of any language in section 66427.5 expressly excepting mobilehome park conversions from those laws, regulations, or policies strongly suggest the section, like the other provisions of the Subdivision Map Act, is intended to operate in conjunction with other state laws.

General principles of statutory interpretation also favor a construction of Government Code section 66427.5 that does not cause it to displace the Coastal Act or the Mello Act. "A court must, where reasonably possible, harmonize statutes, reconcile seeming inconsistencies in them, and construe them to give force and effect to all of their provisions. [Citations.] This rule applies although one of the statutes involved deals generally with a subject and another relates specifically to particular aspects of the subject." (*Hough v. McCarthy* (1960) 54 Cal.2d 273, 279.) Thus, when " 'two codes are to be construed, they "must be regarded as blending into each other and forming a single statute." [Citation.] Accordingly, they "must be read together and so construed as to give effect, when possible, to all the provisions thereof." [Citation.]' " (*Mejia v. Reed* (2003) 31 Cal.4th 657, 663.) Further, " ' "[a]ll presumptions are against a repeal by implication. [Citations.]" [Citation.] Absent an express declaration of legislative intent, we will find an implied repeal "only when there is no rational basis for harmonizing two potentially conflicting statutes [citation], and the statutes are 'irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation.' " [Citation.]' " (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 487; accord, *Schatz v. Allen Matkins Leck Gamble & Mallory LLP* (2009) 45 Cal.4th 557, 573.)

Government Code section 66427.5 can be construed to require a hearing devoted exclusively to the issue of economic displacement of tenants *in addition*

20

to the procedures and hearings required by other state laws. Such a construction is consistent with the general application of the Subdivision Map Act *and* the Coastal Act and the Mello Act to developments within the coastal zone, harmonizing the provisions of all three acts. This construction is consistent as well with the Mello Act's express mandate that its provisions apply to mobilehome park conversions within the coastal zone. (Gov. Code, § 65590, subds. (b), (g)(1).) A contrary construction of section 66427.5, one that denies enforcement of the Coastal Act and the Mello Act in connection with mobilehome park conversions within the coastal zone, not only fails to harmonize the section with those acts but, by overriding their provisions, also effects an implied partial repeal of them. (See *Schatz v. Allen Matkins Leck Gamble & Mallory LLP*, *supra*, 45 Cal.4th at p. 573.) We would adopt it only if no other construction were feasible.

That Government Code section 66427.5, like the Mello Act, seeks to preserve affordable housing within the coastal zone does not render the statutes fatally incompatible. Section 66427.5 establishes specific measures to avoid the economic displacement of all nonpurchasing mobilehome park residents through notice, an opportunity to purchase, and measured rent increases. Nothing requires either the subdivider or the purchasing residents to maintain or provide any low- or moderate-income housing stock. In contrast, the Mello Act requires a developer to provide replacement low- and moderate-income housing in order to maintain a variety of housing stock within the coastal zone. (Gov. Code, § 65590.) The statutes thus address different subjects: one protects current residents, the other maintains adequate low- and moderate-income housing stock in the coastal zone for future residents. There is no conflict between them.

We recognize that requiring compliance with the Mello Act and the Coastal Act may slow down the conversion process. But that result, even if not fully consistent with the Legislature's expressed desire, in the MPROP, to encourage or

21

facilitate conversions, does not create so serious a repugnancy between statutory schemes as to justify a construction of Government Code section 66427.5 that effects an implied repeal of the Coastal Act and the Mello Act.

Nor is it by any means certain the Legislature would have assumed compliance with the Coastal Act or the Mello Act would pose significant obstacles to mobilehome park conversions. The goals of those acts are not incompatible with Government Code section 66427.5 or with a desire to protect mobilehome parks as a source of affordable housing, and Palisades Bowl has not shown that requiring a coastal permit or Mello Act compliance will unreasonably burden conversions to resident ownership. To the contrary, if, as Palisades Bowl insists, its conversion will have no effect on the interests protected by the Coastal Act, it may be able to obtain an exemption from the necessity of obtaining a coastal permit. (Pub. Resources Code, § 30624.7). In addition, although requiring compliance with the Mello Act may delay the conversion process, Government Code section 66427.5, subdivision (e), by creating a uniform statewide procedure for protecting nonpurchasing residents against economic displacement, streamlines the process by addressing the issue most likely to create a stumbling block to conversion. The Legislature reasonably may have concluded such a procedure provides an adequate response to the desire to encourage and facilitate conversions.

Finally, a related provision of the Subdivision Map Act also argues against Palisades Bowl's interpretation. Government Code section 66427.5 generally refers to the conversion of a rental mobilehome park to resident ownership. Government Code section 66428.1 governs conversions when at least two-thirds of the park's tenants sign a petition indicating their intent to purchase the park for purposes of converting it to resident ownership. Section 66428.1 states a general rule requiring waiver of the requirement for a parcel map or a tentative and final

map for tenant-initiated conversions, but excepts from that rule conversions where design or improvement requirements are necessitated by significant health or safety concerns (*id*., subd. (a)(1)), the local agency determines there is an exterior boundary discrepancy that requires recordation of a new parcel or tentative and final map (*id*., subd. (a)(2)), the existing parcels were not created by a recorded parcel or final map (*id*., subd. (a)(3)), or the conversion would result in the creation of more condominium units or interests than the number of tenant lots or spaces that existed prior to conversion (*id*., subd. (a)(4)). Accordingly, despite the Legislature's expressed interest, in the MPROP, of promoting mobilehome park conversions to resident ownership, section 66428.1 contemplates some form of local scrutiny for the purpose of determining whether or not waiver is warranted, and by specifying conditions that preclude waiver, it further implies that the agency charged with the obligation to review map applications has the authority to address those conditions when determining whether to approve, conditionally approve, or disapprove the map. That the Legislature did not intend to prevent all review even of tenant-initiated conversions to address local concerns argues against a construction of Government Code section 66427.5 that prevents review of owner-initiated conversions for compliance with state law.

For the reasons we have stated, we find a construction of Government Code section 66427.5 that does not exempt residential conversions from the Coastal Act and the Mello Act to be consistent with the language of the section and its context, and finds significant support in the rules of statutory construction disfavoring implied repeal of laws and favoring harmony between code provisions. Palisades Bowl argues, however, that the legislative history of the section reveals that the Legislature intended to exempt conversions from the requirements of other state laws. That history has been chronicled in other cases (see, e.g., *Colony Cove Properties, LLC v. City of Carson* (2010) 187 Cal.App.4th 1487, 1497-1504;

23

*Sequoia Park Associates v. County of Sonoma*, *supra*, 176 Cal.App.4th at pp. 1282-1287; *El Dorado Palm Springs, Ltd. v. City of Palm Springs* (2002) 96 Cal.App.4th 1153, 1166-1174 (*El Dorado*)), and because little in the history prior to the 2002 amendment of section 66427.5 sheds light on the meaning of section 66427.5, subdivision (e), it need not be described in great detail here.  Palisades Bowl cites it chiefly for the Legislature's response to the decision in *El Dorado*. We find, to the contrary, the Legislature did no more than signal its intent to bar local governmental entities from imposing their own conditions for the protection of tenants on conversions to resident ownership.

An understanding of *El Dorado* begins with an earlier case, *Donohue v. Santa Paula West Mobile Home Park* (1996) 47 Cal.App.4th 1168.  There, the Second District rejected an argument that provisions of Government Code section 66427.5 allowing for increases in rent after conversion (*id.*, former subd. (d)(1), now subd. (f)(1)) take effect when a subdivider files a tentative map as the first step toward conversion to resident ownership.  The court held that the provisions do not take effect until conversion occurs (*Donohue*, at p. 1173), observing that a contrary conclusion would mean "every park owner could purchase a lifetime exemption from local rent control for the cost of filing a tentative map, even if park residents have no ability to purchase and even if local government disapproves the tentative map.  Park residents could then be economically displaced by unregulated rent increases.  This is the very circumstance section 66427.5 was enacted to prevent."  (*Id.* at p. 1175.)

The decision in *Donohue* did not render it impossible to use Government Code section 66427.5 to avoid local rent control.  For example, an owner could obtain approval for a conversion, take the steps necessary to "convert" the park so as to exempt it from local rent control, but make no further effort to transfer ownership of the newly created lots to residents, thereby enabling the owner to

24

continue to rent the units to tenants without the burden of local rent control. In *El Dorado*, *supra*, 96 Cal.App.4th 1153, the City of Palm Springs had responded to that possibility by making its approval of a proposed conversion subject to conditions designed to ensure the conversion was bona fide. One condition would delay conversion, and thus the force of section 66427.5's rent increase provisions, until escrow had closed on approximately one-third of the units. The Fourth District held the conditions violated section 66427.5. It found a park is converted to resident ownership when the first unit is sold (*El Dorado*, at p. 1166), thus confirming it would be possible for a park owner to avoid local rent control by means of a "sham" conversion. The court expressed concern that section 66427.5 therefore could be used to avoid local rent control by means of "sham transactions," suggesting the Legislature might wish to broaden the authority of local entities to regulate conversions. (*El Dorado*, at p. 1165.) But it held that section 66427.5, in what was then subdivision (d), "provides that 'The scope of the hearing shall be limited to the issue of compliance with this section.' Thus, the City lacks authority to investigate or impose additional conditions to prevent sham or fraudulent transactions at the time it approves the tentative or parcel map." (*El Dorado*, at p. 1165.)

In 2002, the Legislature responded to the decision in *El Dorado* by amending Government Code section 66427.5, moving the section's hearing requirements to a new subdivision (e) and adding a new subdivision (d), which imposes on the subdivider the obligation to obtain a survey of tenants to determine tenant support for a conversion and submit the results of the survey to the local agency "to be considered as part of the subdivision map hearing prescribed by subdivision (e)." (Gov. Code, § 66427.5, subd. (d)(5), added by Stats. 2002, ch. 1143, § 1, p. 7399.) The Legislature also enacted, but did not include in the code amendments, language reciting: "It is the intent of the Legislature to address

25

the conversion of a mobilehome park to resident ownership that is not a bona fide resident conversion, as described by the Court of Appeal in El Dorado . . . .  It is, therefore, the intent of the Legislature in enacting this act to ensure that conversions pursuant to Section 66427.5 of the Government Code are bona fide resident conversions."  (Stats. 2002, ch. 1143, § 2, pp. 7399-7400.)[6]  But the Legislature rejected a proposal that would have granted local agencies authority to impose "any additional conditions of approval that the local legislative body or advisory agency determines are necessary to preserve affordability or to protect nonpurchasing residents from economic displacement."  (Sen. Amend. to Assem. Bill No. 930 (2001-2002 Reg. Sess.) June 26, 2002, § 1, p. 3, italics omitted.)

Palisades Bowl asserts the Legislature's failure to adopt provisions conferring additional authority on local agencies proves the Fourth District in *El Dorado*, *supra*, 96 Cal.App.4th 1153, correctly interpreted Government Code section 66427.5 as precluding local governmental agencies from investigating or imposing additional conditions on mobilehome park conversions to prevent sham or fraudulent transactions.  It reasons, further, that the Legislature's limited response to that decision and its expressed interest in promoting mobilehome park conversions to resident ownership lead inexorably to the conclusion the Legislature intended to prevent local agencies from denying conversion applications for any reason besides noncompliance with section 66427.5.  But the Fourth District in *El Dorado* was concerned only with conditions that had been

---

[6]     This language is part of what is known as a " 'plus section' " of a bill:  a provision "that is not intended to be a substantive part of the code section or general law that the bill enacts, but [expresses] the Legislature's view on some aspect of the operation or effect of the bill."  (*People v. Allen* (1999) 21 Cal.4th 846, 858-859, fn. 13.)

26

imposed on a conversion by a local entity to protect tenants, and neither its holding nor the Legislature's response to it can reasonably be read to support an argument neither addresses:  whether section 66427.5, even if it precludes local regulation to prevent sham conversions, also bars state-mandated local review of conversions for compliance with other state laws.

For the same reason, we find little if any support for Palisades Bowl's position in two appellate court cases that, like the present case, were decided after the 2002 amendments to Government Code section 66427.5.  In *Sequoia Park Associates v. County of Sonoma*, *supra*, 176 Cal.App.4th 1270, the First District invalidated a local ordinance that specified the actions a subdivider was required to take to prove a proposed conversion was "a bona fide resident conversion" (*id.* at p. 1274).  The court reasoned that the Legislature has expressly and impliedly preempted all local regulation of mobilehome park conversions to resident ownership.  (*Id.* at pp. 1275, 1297-1300.)  The following year, the Second District issued its opinion in the present case, and on the same day also decided *Colony Cove Properties, LLC v. City of Carson*, *supra*, 187 Cal.App.4th 1487.  It found there that, "[w]hen it overhauled sections 66427.4 and 66427.5 in 1995, the Legislature deprived local entities and agencies of the authority to 'enact[] more stringent measures' regulating conversions of mobilehome parks to resident ownership, thereby conveying its intent to prevent localities from unduly impeding resident conversions." (*Id.* at p. 1506.)  The court further observed that the Legislature's later rejection of the proposal to authorize local agencies to impose additional conditions of approval "demonstrates that it continues to oppose local deviation from or addition to the statutory criteria." (*Ibid.*)

Although broadly stating that Government Code section 66427.5 precludes local regulation of mobilehome park conversions to resident ownership, neither *Sequoia Park* nor *Colony Cove* considered the specific issues presented by this

27

case: whether the section exempts conversions from other state laws, such as the Coastal Act and the Mello Act, or bars local agencies from exercising the authority delegated to them by the Coastal Act and the Mello Act to require compliance with those acts and to reject or deny applications that do not establish compliance. They do not, accordingly, provide authority supporting either argument.

## CONCLUSION

We hold that Government Code section 66427.5, which states a uniform, statewide procedure for protecting nonpurchasing residents against economic displacement, does not exempt conversions of mobilehome parks to resident ownership from the requirements of the Coastal Act (Pub. Resources Code, § 30000 et seq.) or the Mello Act (Gov. Code, §§ 65590, 65590.1), which also apply to such conversions, and has no effect on the authority those acts delegate to local entities to enforce compliance with their provisions. Local agencies therefore are not precluded from establishing such procedures and holding such hearings as are appropriate to fulfill their responsibilities to ensure compliance with the Coastal Act and the Mello Act.

The judgment of the Court of Appeal is affirmed.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**KLINE, J.**\*

---

**\*** Presiding Justice, Court of Appeal, First Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**DISSENTING OPINION BY KENNARD, J.**


Government Code section 66427.5 (section 66427.5) sets forth requirements for subdividing a mobilehome park for the purpose of converting it to resident ownership — that is, a mobilehome park in which the residents own, rather than rent, the parcels on which their mobilehomes are situated. The majority holds that when a mobilehome park is located within the coastal zone, a person or entity seeking to convert the park to resident ownership must comply not only with section 66427.5 but also with the California Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq.; hereafter Coastal Act) and the Mello Act (Gov. Code, § 65590).

I disagree. Because subdividing a mobilehome park to convert it to resident ownership does not involve a change in the density or intensity of the property's use, it is not a "development" within the meaning of the Coastal Zone Act, and therefore it is not subject to regulation under that act. Nor does the Mello Act apply. The plain language of section 66427.5's subdivision (e) shows that the Legislature intended section 66427.5 to displace other state laws such as the Mello Act.

**I**

Plaintiff Pacific Palisades Bowl Mobile Estates, LLC (Palisades Bowl) owns a mobilehome park with more than 170 units. The park is in the coastal

1

zone across Pacific Coast Highway from Will Rogers State Beach in the City of Los Angeles (the City). In November 2007, after various discussions with City's planning officials, Palisades Bowl attempted to file an application to convert its mobilehome park to resident ownership. City officials refused to accept the application, insisting it was incomplete because it did not include, among other things, a coastal development permit and a Mello Act affordable housing determination.

In January 2008, Palisades Bowl filed in superior court a petition for writ of mandate together with a complaint for declaratory and injunctive relief. Palisades Bowl alleged, among other things, that the City had improperly refused to accept its subdivision application and that the City lacks discretion to impose any requirements other than those set forth in section 66427.5. Palisades Bowl requested a writ or injunction commanding the City to accept its application, deem it complete, and make a decision either approving or denying it.

The superior court issued a peremptory writ of mandate commanding the City to vacate its decision finding Palisades Bowl's application incomplete, deem it complete, and evaluate it without regard to whether it complied with either the Coastal Act or the Mello Act. On the City's appeal, the Court of Appeal reversed with directions to vacate the peremptory writ and enter judgment for the City. This court granted review.

**II**

This case presents issues of statutory construction. In construing statutes, a court aims "to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law." (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715; accord, *Klein v. United States of America* (2010) 50 Cal.4th 68, 77; *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 986.) To achieve this goal, a court begins by looking to the

words of the statute, "because the statutory language is generally the most reliable indicator of legislative intent." (*Hassan v. Mercy American River Hospital*, *supra*, at p. 715; accord, *Klein v. United States of America*, *supra*, at p. 77; *Chavez v. City of Los Angeles*, *supra*, at p. 986.) If the statutory language is not ambiguous, its plain meaning governs. (*In re Ethan C.* (2012) 54 Cal.4th 610, 627; *People v. Toney* (2004) 32 Cal.4th 228, 232.)

The Coastal Act does not expressly require a permit for mobilehome park conversions to resident ownership, but it does require a permit for any "development." (Pub. Resources Code, § 30600.) The issue, then, is whether a mobilehome park conversion to resident ownership is a "development" within the Coastal Act's definition of that term as, among other things, a "change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act . . . and any other division of land, including lot splits, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use" (Pub. Resources Code, § 30106). Under the plain meaning of this definition, a mobilehome park conversion to resident ownership is not a "development" because it does not change the density or intensity of use of the land, but merely changes the form of its ownership. After the conversion, the same number of mobilehomes will remain in the same locations, each occupied by a single household.

The majority concludes otherwise. It reasons that "by introducing a list of projects, including 'subdivision,' with the phrase 'including, but not limited to,' the Legislature in Public Resources Code section 30106 has explained that each listed project *is* a change in the intensity of use for purposes of the act . . . ." (Maj. opn., *ante*, at p. 5.) The majority states: "*Any* subdivision under the Subdivision Map Act thus is, *by definition*, a species of change in the density or intensity of use

3

of land and is a 'development.' " (*Ibid.*; see also *id.* at p. 8 ["In short, *all* subdivisions, including mobilehome park conversions, are 'developments' for purposes of the Coastal Act."].)

The majority's approach leads to statutory constructions that the Legislature is unlikely to have intended. For example, if a statute defined "antique American car" as "any car manufactured in the United States before 1940, including, but not limited to, a Ford, Chevrolet, or Chrysler," the majority's approach would mean that *every* Ford, Chevrolet, and Chrysler *by definition* is an "antique American car," regardless of where or when it was made. Such a construction would be nonsensical because it nullifies important elements in the statutory definition. I would construe this hypothetical statutory definition to mean that a Ford, Chevrolet, or Chrysler is an "antique American car" if, but only if, it was manufactured in the United States before 1940.

Another example, involving an actual statutory definition, is provided by *People v. Arias* (2008) 45 Cal.4th 169 (*Arias*). At issue there was the meaning of Health and Safety Code section 11366.8, making it a crime to possess a "false compartment" in a vehicle. The statute defines "false compartment" as "any box, container, space, or enclosure that is intended for use or designed for use to conceal, hide, or otherwise prevent discovery of any controlled substance within or attached to a vehicle, including, but not limited to, . . . [¶] . . . [¶] . . . [o]riginal factory equipment of a vehicle that is modified, altered, or changed. . . ." (Health & Saf. Code, § 11366.8, subd. (d).) This court construed that provision as "exclud[ing] from its definition of 'false compartment' a vehicle's original factory equipment that has not been modified, altered, or changed in any way." (*Arias*, *supra*, at pp. 173-174.)

The majority here cites *Arias*, *supra*, 45 Cal.4th 169, for the proposition that whenever a statutory definition contains a list introduced by the phrase

4

"including, but not limited to," then every item on the list necessarily must, in every instance, fall within the statutory definition. (Maj. opn., *ante*, at p. 5.) The flaw in that reasoning becomes apparent if it is applied to the statutory definition at issue in *Arias*. Under the majority's reasoning, as applied to Health and Safety Code section 11366.8, *any* modification of a vehicle's original factory equipment *by definition* produces a false compartment, regardless of whether the modification meets the statute's requirement of being intended or designed for use to conceal a controlled substance. Surely this cannot be what the Legislature contemplated. I would construe the statute in *Arias* as meaning that modified original factory equipment is a "false compartment" if, but only if, it is "intended for use or designed for use to conceal, hide, or otherwise prevent discovery of any controlled substance within or attached to a vehicle" (Health & Saf. Code, § 11366.8, subd. (d)). By the same token, a subdivision or other division of land qualifies as a "development" under the Coastal Act if, but only if, it will result in a "change in the density or intensity of use of land" (Pub. Resources Code, § 30106). As this court explained in *Arias*, in construing a statutory definition, a court must be careful not to "render nugatory the qualifiers that the Legislature purposefully included . . . ." (*Arias*, *supra*, 45 Cal.4th at p. 181.)

To summarize: Because subdividing a mobilehome park under section 66427.5 for the purpose of converting it to resident ownership involves no change in the density or intensity of the land's use, it is not a development under the Coastal Act, no coastal permit is required, and no conflict exists between section 66427.5 and the Coastal Act.

This leaves the Mello Act, which establishes housing requirements within the coastal zone for persons and families with low or moderate incomes. In particular, it prohibits authorizing the conversion or demolition of existing residential units occupied by persons and families of low or moderate income

5

unless provision has been made for replacement with other similar units. The Mello Act expressly applies to the conversion of a mobilehome or mobilehome lot in a mobilehome park lot "to a condominium, cooperative, or similar form of ownership." (Gov. Code, § 65590, subd. (g)(1).)

Section 66427.5 contains its own safeguards to avoid economic displacement of nonpurchasing tenants with low or moderate incomes. The subdivider (usually the mobilehome park's owner) must offer each tenant the option to continue renting the space rather than buying it. (§ 66427.5, subd. (a).) If the tenant chooses to continue renting, section 66427.5 limits rent increases. (§ 66427.5, subd. (f).) For lower income households, increases cannot exceed the rise in the Consumer Price Index. (§ 66427.5, subd. (f)(2).) The subdivider also must survey all the tenants to find out if they favor the conversion to resident ownership and give copies of the survey results to the local agency as part of the subdivision application. (§ 66427.5, subd. (d).)

For mobilehome park conversions to resident ownership, application of the Mello Act is precluded by section 66427.5's subdivision (e), which reads: "The subdivider shall be subject to a hearing by a legislative body or advisory agency, which is authorized by local ordinance to approve, conditionally approve, or disapprove the map. *The scope of the hearing shall be limited to the issue of compliance with this section*." (Italics added.) By limiting the issues at the hearing on the subdivision application to compliance with section 66427.5 itself, the plain language of this provision bars application of other state laws such as the Mello Act.

Reaching a different conclusion, the majority states that the language of section 66427.5's subdivision (e) "can be construed to require a hearing devoted exclusively to the issue of economic displacement of tenants *in addition* to the procedures and hearing required by other state laws." (Maj. opn., *ante*, at pp. 20-

6

21.)  But nothing in the statutory language suggests that the Legislature intended such a cumbersome and inefficient system, mandating multiple hearings for piecemeal consideration of overlapping and redundant statutory requirements before a subdivision map may be approved.  To subdivide a mobilehome park for conversion to resident ownership, section 66427.5 requires a single application and a single hearing limited to the question of compliance with section 66427.5, to be followed by approval or disapproval.  Thus, section 66427.5 alone governs the subdivision map approval.

For the reasons stated above, I conclude that irrespective of whether a mobilehome park is located within the coastal zone, the person or entity seeking to convert the park to resident ownership must comply only with section 66427.5 and need not also comply with either the Coastal Act or the Mello Act.  Therefore, I would reverse the judgment of the Court of Appeal and direct that court to affirm the superior court's judgment.


KENNARD, J.


7

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 187 Cal.App.4th 1461
**Rehearing Granted**

_____

**Opinion No.** S187243
**Date Filed:** November 29, 2012

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** James C. Chalfant

_____

**Counsel:**

Bien & Summers, Elliot L. Bien, Amy E. Margolin; Blum Collins and Craig M. Collins for Plaintiff and Appellant.

Bien & Summers, Elliot L. Bien and Amy E. Margolin for Western Manufactured Housing Communities Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Hart, King & Coldren, Robert S. Coldren, C. William Dahlin and Boyd L. Hill for Laguna Terrace Park, LLC, as Amicus Curiae on behalf of Plaintiff and Appellant.

R. S. Radford for Pacific Legal Foundation as Amicus Curiae on behalf of Plaintiff and Appellant.

Gilchrist & Rutter, Richard H. Close, Thomas W. Casparian and Yen N. Hope for Carson Harbor Village, Ltd., as Amicus Curiae on behalf of Plaintiff and Appellant.

Carmen A. Trutanich, City Attorney, Jeri L. Burge, Assistant City Attorney, Kenneth T. Fong and Amy Brothers, Deputy City Attorneys, for Defendant and Appellant.

Kirkland & Ellis, Robyn E. Bladow and Vidhya Ragunathan for Western Center on Law and Poverty as Amicus Curiae on behalf of Defendant and Appellant.

Law Office of William J. Constantine and William J. Constantine for Golden State Manufactured-Home Owners League as Amicus Curiae on behalf of Defendant and Appellant.

Kamala D. Harris, Attorney General, Manuel M. Medeiros, State Solicitor General, John A. Saurenman, Assistant Attorney General, and Jamee Jordan Patterson, Deputy Attorney General, for California Coastal Commission as Amicus Curiae on behalf of Defendant and Appellant.

Richards, Watson & Gershon, Rochelle Browne and Ginetta L. Giovinco for League of California Cities as Amicus Curiae on behalf of Defendant and Appellant.

Aleshire & Wynder, William W. Wynder, Sunny K. Soltani and Jeff M. Malawy for Palisades Bowl Residents' Association, Inc., and City of Carson as Amici Curiae on behalf of Defendant and Appellant.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Elliot L. Bien
Bien & Summers
23 Palomino Road
Novato, CA 94947
(415) 898-2900

Amy Brothers
Deputy City Attorney
700 City Hall East
200 North Main Street
Los Angeles, CA 90012
(213) 978-8069