BIGELOW, P. J.,
Concurring and Dissenting. — I concur in part and respectfully dissent in part.
I agree with the majority opinion’s conclusion that the City of Carson (City) properly considered the issue of whether Carson Harbor Village, Ltd.’s (the park) proposed conversion was inconsistent with the City’s general plan. As I indicated in Carson Harbor Village, Ltd. v. City of Carson (Mar. 30, *78 2010, B211777) (nonpub. opn.), I do not read the mobilehome park conversion statute (see Gov. Code, § 66427.5)[1] to have established a stand-alone process granting a park’s residents a simple veto by vote over a proposed conversion. Section 66427.5 added a preliminary step in the subdivision process in the context of a mobilehome park conversion to resident-owned spaces to address resident displacement concerns, leaving in place the broader structure of the Subdivision Map Act (§ 66410 et seq.). In Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles (2012) 55 Cal.4th 783 [149 Cal.Rptr.3d 383, 288 P.3d 717], the Supreme Court clarified that section 66427.5 did not strip away California Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq.; Coastal Act) and Mello Act (§§ 65590, 65590.1) jurisdiction over land use matters involving a proposed mobilehome park conversion. By parity of reasoning, I would find that section 66427.5 does not displace a subdivider’s obligation to comply with the requirements of a city’s general plan. (See § 65300 et seq.) As the majority notes, a city’s general plan acts much like a land use constitution, governing future land use decisions within its jurisdiction. (Lesher Communications, Inc. v. City of Walnut Creek (1990) 52 Cal.3d 531, 540, 542 [277 Cal.Rptr. 1, 802 P.2d 317].) I see no reason that a general plan ought to be afforded less importance than the Coastal or Mello Acts.
I depart with the majority opinion in its conclusion that substantial evidence supports the City’s determination that the park’s proposed conversion is inconsistent with the City’s general plan. The “open space” element (see § 65560 et seq.) of the City’s general plan is the only contested issue in the current case. As relevant to the current case, the City’s “Open Space and Conservation Element” of its general plan reads as follows: “The Government Code requires that open space for the preservation of natural resources be incorporated into the General Plan. Such resources include areas required for the preservation of plant and animal life, areas of ecological and other scientific study value, rivers, streams, bays and estuaries, coastal beaches, and lake shores. The only such area identified within Carson is the lake within the Carson Village Mobilehome Park. This lake, covering approximately 17 acres, provides habitat for a variety of plants and small animals.”
In my view, the issue is whether the park’s proposed conversion will damage or endanger the lake, with its habitat for a variety of plants and small animals. I see no evidence in the record to support a conclusion that a change in the structure of the ownership of the park — from a landlord, single owner (a limited partnership) to a collective of individual owners with a managing homeowners association — will harm the lake. A mobilehome park with a lake was present before conversion and will still be present after conversion. The change in identity of the owner of the property, which is all that is truly at issue here, has not been shown to pose a danger to the lake.
*79 The majority opinion concludes that substantial evidence supports the City’s finding that there would be a risk to the lake “because the residents would become unwilling and unsuitable stewards” of the lake. (Maj. opn., ante, at p. 72.) The ensuing discussion which follows, however, focuses on the environmental conditions of the lake, i.e., the physical problems and potential problems attendant with the lake. For example, the majority discusses trash, ongoing maintenance needs, and the future potential need for remedial measures in the event of a contamination incident arising from capped oil wells in the area. However, the critical issue in this case is the management of the lake property. That is, whether there is evidence that the physical conditions of the lake are only capable of being properly managed with the existing single-owner structure in place, as opposed to a homeowners association after conversion. I do not see any such evidence. There is no evidence in the record to support a conclusion that the park’s residents acting through a homeowners association would be less suitable stewards of the lake property than the current landlord, single owner of the property, or that the City would incur more difficulties in compelling needed environmental remedial measures against numerous individual owners acting through a homeowners association than it would against a landlord, single owner of the property.
I acknowledge that Dunex, Inc. v. City of Oceanside (2013) 218 Cal.App.4th 1158 [160 Cal.Rptr.3d 670] supports the majority’s opinion, but I am not convinced. Dunex offers no discussion of any evidence supporting its conclusion that a change from a landlord, single owner structure to a homeowners association, multiple-owner structure poses a risk to open space. Dunex seems simply to accept that a city may find that individual owners of a mobilehome park will not be as good citizens as a prior landlord, single owner had been. If Dunex is stating that the individual owners of a mobilehome park will not have the financial resources to respond to problems as the prior landlord, single owner did, its conclusion is based on speculation as to the financial condition of the prior landlord owner. There is no evidence cited in Dunex actually showing the financial ability of anyone to address environmental problems. In the absence of evidence that a homeowners association would be less responsible, and or have less resources in matters of property management than a landlord, single owner of a property, I would affirm.
The only evidence in the record here concerning the management of the lake property is that the current owner undertook cleanup efforts in 2006 and 2007, and that annual maintenance costs are around $50,000. It is undisputed that there are 420 spaces in the park. Thus, the annual maintenance costs divided amongst residents would be approximately $120, or about $10 per month. I would not find the imposition of $10 per month in maintenance costs to support a conclusion that the management of the park will be harmed in the future.
*80 I would affirm the trial court’s judgment directing the City to approve the park’s application to convert its mobilehome park from a rental facility into a subdivision of resident-owned lots with a homeowners association.
A petition for a rehearing was denied August 21, 2015, and the opinion was modified to read as printed above. Respondent’s petition for review by the Supreme Court was denied October 28, 2015, S229171.

 All further statutory references are to the Government Code.