Filed 3/27/23 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| PACIFIC PALISADES RESIDENTS ASSOCIATION, INC., <br><br>     Petitioner and Appellant, <br><br>    v. <br><br>CITY OF LOS ANGELES et al., <br><br>    Defendants and Respondents; <br><br>RONY SHRAM et al., <br><br>    Real Parties in Interest and Respondents. | B306658 <br><br> Los Angeles County <br> Super. Ct. No. BS174471 <br><br> **ORDER MODIFYING OPINION** <br><br> **[NO CHANGE IN JUDGMENT]** |

THE COURT:

IT IS ORDERED that the opinion in the above-entitled matter filed on March 8, 2023, be modified as follows:

On page 11, line 2, the phrase "claim of exemption" shall be replaced with "appealable action on a coastal development permit or a claim of exemption."

There is no change in the judgment.

_____
STRATTON, P. J.          WILEY, J.          VIRAMONTES, J.

Filed 3/8/23 (unmodified opinion)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| PACIFIC PALISADES RESIDENTS ASSOCIATION, INC., | B306658 |
|---|---|
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. BS174471 |
| v. | |
| CITY OF LOS ANGELES et al., | |
| Defendants and Respondents; | |
| RONY SHRAM et al., | |
| Real Parties in Interest and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, John A. Torribio, Judge. Affirmed.

John B. Murdock; Law Offices of Thomas M. Donovan and Thomas M. Donovan for Plaintiff and Appellant.

Michael N. Feuer, City Attorney, Terry Kaufmann-Macias, Senior Assistant City Attorney, Donna L. Wong and Oscar Medellin, Deputy City Attorneys; Downey Brand, Kathryn L. Oehlschlager and Hina Gupta for Defendant and Respondent City of Los Angeles.

Rob Bonta, Attorney General, Daniel A. Olivas, Senior Assistant Attorney General, Andrew M. Vogel, Supervising Deputy Attorney General, and Justin J. Lee, Deputy Attorney General, for Defendant and Respondent California Coastal Commission.

Jeffer Mangels Butler & Mitchell and Matthew D. Hinks for Real Parties in Interest and Respondents.

_____

People who do not want an eldercare facility built near them have been fighting the project since 2017.  Others want the facility, saying the project would fit the neighborhood and the public needs it.  The trial court rejected the opponents' challenge, which was based on Los Angeles zoning laws, the California Environmental Quality Act, and the Coastal Act.  These neighbors appealed.  The three respondents—the City of Los Angeles, the California Coastal Commission, and the developer— defend the trial court ruling.  We affirm.

## I

We summarize facts from the 10,425-page record.

## A

The vacant one-acre lot was zoned for commercial use in 1978.  The site was graded in the early 1970s; today it has no trees and few plants.  A photo shows bare flat dirt behind a chain link fence.

2

The lot is at the corner of Palisades Drive and Vereda De La Montura in Pacific Palisades, which is an oceanside part of the City of Los Angeles with a 2008 population of some 25,000. (L.A. Times, Mapping L.A., Pacific Palisades profile, <https://maps.latimes.com/neighborhoods/neighborhood/pacific-palisades/index.html> (as of March 6, 2023), archived at <https://perma.cc/Z7JJ-NMZX>.)  The lot is "located within a densely developed 740-unit residential subdivision known as the Headlands."  About half the homes in the immediate area are multifamily units; the others are single family homes.  There are many large two- and three-story residential condominium units.

The area immediately surrounding the lot includes a restaurant, an office and business center, and residential condominiums.  To the north and east are multifamily condominiums; to the south is commercial development.

The lot is within Los Angeles city limits; all municipal references are to that city.  The parcel is within the coastal zone, about two and a half miles from the coast.  Large public parks with hillside hiking trails are nearby.

The respondent developer bought this lot in 2013 and, after consultation with some neighborhood organizations, proposed a four-story project.  The developer explained his motivation in a 2017 letter to neighbors.  "The decision to pursue senior living was made with feedback we received from some members of the Highlands community who expressed a lack of options for older adults who wish to age in place.  These sentiments were echoed by two independent market studies showing that Los Angeles in general and the Palisades in particular lack adequate housing for seniors, trailing nearly every major metropolitan area in the country."  The developer sought to "establish a communication

channel" with neighbors to "make the process as smooth and unobtrusive as possible." He hoped to break ground in 2018.

The record contains a detailed description of the eldercare project with architectural plans, maps, and images. The developer proposed 82 residential rooms in a 64,646 square foot building with underground parking. The ground floor of the building would have residential rooms, a public bistro, and other features, with more residential rooms on the other three floors. The building's height would range from 25 to 45 feet, making it one story higher than the tallest nearby structures. City zoning allowed for a building of this height on this lot.

B

This dispute began in June 2017, when the developer applied to the City's planning department for permission to build in accordance with the Los Angeles zoning code. He sought a coastal development permit and a "Class 32 infill project exemption" from the California Environmental Quality Act. Later we return to Class 32 exemptions.

Land use regulation in Los Angeles can be intricate. This application proceeded through six layers of review:

1. the City Zoning Administrator,
2. the West Los Angeles Area Planning Commission,
3. the Planning and Land Use Management Committee of the Los Angeles City Council,
4. the Los Angeles City Council itself,
5. the California Coastal Commission, and
6. the Superior Court.

We summarize these layers of scrutiny.

///

///

4

1

A Los Angeles zoning administrator conducted the first review. The administrator announced a public hearing on the project, which prompted community reactions.

Some people favored the project. For instance, a 45-year Palisades resident wrote as the chairman of the Palisades Highlands Presidents Council, a group of some 20 individual homeowners associations. The chairman related how the developer contacted this Council in 2013 to discuss possible plans before buying the site. The Council did not want another shopping center or office building. The developer worked with the Council from 2014 to 2017. The Council polled each individual homeowners association in 2015. "The results revealed that the majority of those who voted in the survey in the Highlands preferred the 64,000-square foot residential structure proposed by the developer." The chairman reported the developer had worked closely with member associations to address their concerns.

The chairman added that "[t]here is a substantial population of older residents who have lived in the Palisades Highlands or adjacent neighborhoods for decades and dread the prospects of having to move away, particularly those in town homes with many stairs. This project provides an option for them to remain in the community . . . . It also allows some of the younger crowd living here to bring their parents closer to them. It is our responsibility as a society to house the elderly in the very same neighborhoods in which they have lived for many years, rather than callously pushing them out of the community that they know and love."

Others were adamantly opposed to the proposal. This opposition was substantial and ranged over many subjects.

Opponents raised issues, for instance, about parking, traffic, fire hazards, the lack of nearby medical resources for seniors, the intrusion of the project upon the views and natural beauty of the area, and disruption the construction would cause.

On October 4, 2017, the zoning administrator held a public hearing attended by the developer and some 40 community members. Some people from the community spoke in favor of the project; some spoke against it.

On January 26, 2018, the administrator issued a 32-page single-spaced decision approving the proposal and granting a coastal development permit. The administrator found the project had no significant effect on the environment and therefore, by virtue of the Class 32 categorical exemption, was exempt from the provisions of the California Environmental Quality Act.

The administrator found the project was consistent with the area's general plan and zoning; specifically, it was consistent with the Brentwood-Pacific Palisades Community Plan. This plan is a 60-page document the City's planning department has posted online. (https://planning.lacity.org/odocument/abf34149-0480-4d2d-9506-26b8e06fe185/Brentwood Pacific%20Palisades%20Community%20Plan.pdf (as of March 6, 2023), archived at <https://perma.cc/74WT-AUKY>.) It is a part of the general plan for Los Angeles, and was last updated in 1996. "The City of Los Angeles has the responsibility to revise and implement the City's General Plan." (*Id.* p. II-3; see also L.A. Municipal Code, Art. 1.5, <https://codelibrary.amlegal.com/codes/los_angeles/latest/lamc/0-0-0-107706#JD_11.5.1.> (as of March 6, 2023), archived at

<https://perma.cc/R48J-7D3E>.)  This plan thus has the stature of municipal hopes and intentions for the City circa 1996.

The administrator found the "site and surrounding area are urbanized areas."  The proposal's design theme would preserve community character.  There was ample landscaping throughout and outside the building.  The site had no threatened species, and there would be no significant impact on traffic or parking.  "The project design is entirely consistent with current surrounding development."

2

Opponents and their counsel appealed this decision to the West Los Angeles Area Planning Commission in February 2018.  Neighbors filed a 58-page brief citing a host of objections.

Again, the opponents' objections ranged widely, and included the following:

The project would be inconsistent with the parklike neighborhood, which included features of natural beauty, rugged rocks, and teeming wildlife.  The area was a fire hazard zone and vulnerable to flash floods, slides, and earthquakes.  The eldercare proposal lacked nearby supporting medical, rescue, and emergency facilities.  Neighbors were overwhelmingly opposed to the project.  The project was incompatible with the surrounding wilderness and parklands, would ruin scenic values and views, and would bring excessive density.  The project would worsen parking and traffic congestion and lacked supporting public transportation.  The added traffic would dramatically increase the risk of speeding cars, accidents, injuries, and deaths.  The traffic nightmare would create a significant risk of death and serious injury to pedestrians.  The facility would create intolerable noise.  The proposal did not meet the criteria for a

Class 32 categorical exemption. The neighborhood is not highly urbanized. The project would impair views from a scenic highway and would contradict the area's community plan. The lack of proposed landscaping was appalling and would permanently scar the surrounding wildlands.

Other objections were that the project would threaten a list of 65 species, including amphibians, reptiles, insects, and birds. The zoning administrator ignored evidence the project site was likely to contain or be near archaeological evidence of early tribes, including the Tongva people. The developer low-balled the amount of excavation that would be needed. Dirt hauling operations would cause pollution. The project would unacceptably increase greenhouse gas emissions and posed risks to water quality. Permitting this development would violate the Coastal Act and the zoning code. The modern and unattractive architecture of the proposed building would be out of character with the surrounding Mediterranean and rustic homes.

There were many other individual protests. One person wrote that "[w]e need this project like a hole in the head, period." The protests reiterated issues concerning traffic, parking, noise, safety, and fire hazards. Further objections were to the project's architecture and appearance: it would be an eyesore, a "white elephant," and "large and unsightly."

On April 18, 2018, the West Los Angeles Area Planning Commission held a public hearing on the matter. The 146-page transcript of this hearing is in the record.

This Commission rejected the neighbors' objections and approved the project with some 26 pages of reasons, findings, and conditions of approval. In particular, the Commission found the

project was consistent with the area's general plan, followed its design guidelines, and preserved community character.

3

Opponents again appealed this ruling, and now via diverging proceedings. Neighbors simultaneously appealed to City officials and to the California Coastal Commission. In this section we describe the City process.

On June 5, 2018, the Planning and Land Use Management Committee of the Los Angeles City Council heard the neighbors' appeal from the Commission's decision. This public hearing involved presentations by the City's planning department and interested members of the public.

An experienced real estate attorney spoke for the objectors. He noted over 1,500 people had signed statements opposing the eldercare facility. He said the "biggest insult" was the developer's assertion that the facility site was substantially surrounded by urban uses. He stressed the site's proximity to Santa Ynez City Park and Topanga Canyon State Park, and concluded the surrounding area was parkland, not urban development. He displayed an image he said showed "the massive amount of open space that does actually surround it." The attorney argued the proposal was incompatible with the neighborhood. "The developer will say there are projects that are proximate that are the same height. Of course, they sit up on hillsides, so they're not comparable." The attorney complained about the amount of excavation that would be necessary.

The developer's lawyer rebutted some of these points. "This project is located smack in the middle of the Highlands community, which has been established in this area for decades. [¶] It's bounded at the north by multifamily residential, at the

east by multifamily residential, at the south by a commercial development . . . ." The lawyer argued the appeal was "simply a repeat of their earlier failed appeal to the West Los Angeles Planning Commission," the public hearing that set a record for most highly attended meeting, signifying the project already had been well vetted.

An architect who was president of the Pacific Palisades Civic Group told the committee the "size and massing" of the project complied with the local code, and that the surrounding area "is a highly developed area with many structures exceeding the size of the proposed project." This architect urged the committee to approve the project.

The planning deputy for Los Angeles City Councilmember Mike Bonin told the committee the project "will provide a much-needed community benefit with convenient local residential care for seniors allowing them to stay in the community close to family. The project has been thoughtfully designed in compliance with the Brentwood Pacific Palisades Community Plan by providing the transition between existing commercial and adjacent residential that surround the property [on] three of four sides . . . . Additionally, the Pacific Palisades Community Council did find the proposed eldercare use to be appropriate . . . ."

This Committee voted unanimously to recommend the City Council deny the appeal and approve the project.

4

On June 19, 2018, the City Council held a public hearing and unanimously approved the project.

5

Many opponents—individuals as well as the appellant Association—protested the City's decision to the California

10

Coastal Commission.  Any aggrieved person may appeal a local government's claim of exemption to this Commission, which shall hear the appeal unless the appeal presents "no substantial issue." (Pub. Resource Code, § 30625.)

a

The Commission's staff prepared recommendations for the Commission about whether the appeal raised a substantial issue under the Coastal Act.  The staff analyzed a detailed record that included engineering, biological, fire hazard, traffic, parking and other studies submitted by the neighbors.  The staff also reviewed the voluminous correspondence for and against the project.

On June 29, 2018, the staff issued a 17-page single-spaced report recommending the Commission reject the appeal for want of a substantial issue.  A July 10, 2018 addendum responded to critiques of the 17-page report.

We recount the staff analysis, which concluded the appeal raised no substantial issue under the Coastal Act.

The neighbors' main objections were about whether the project's design and character would have an adverse visual impact, including whether it would block scenic views from streets, from nearby homes, and from park trails.  The project's height, mass, and design, these objections went, would be out of character with the surrounding area.

Commission staff concluded the following.  Public views from nearby trails would not be significantly affected due to the design and site of the project, which would be located in a developed and urbanized area.  Concerns about fire protection, protected species, traffic, and parking were insubstantial.  The

11

project's density, scale, and land use were compatible with the surrounding area.

The site was not an environmentally sensitive habitat. The area had been disturbed by human activity—it had been part of a large residential subdivision since the 1970s—and it contained no threatened or endangered species. The project was within the urban limit line and would not go beyond the boundaries. The project would not significantly degrade parks or recreational areas.

The surrounding buildings were as tall as 36 feet and as large as 27,590 square feet. There was a permitted nearby use of up to 50 feet in height for a church and school. "[T]he nearby residential condo complexes to the north and east do have far larger footprints when you look at those clusters of the buildings in terms of square footage. But they are lower, and they range from two to three stories and 20 to 36 feet in height." The Calvary Christian School Facility, located on the same street within the same subdivision, is more than 60,000 square feet in size, and "it's similar in that it is an institutional use. And the maximum height for structures on that lot was 50 feet."

The staff compared these existing uses to the proposed 64,646 square foot project: "The proposed height ranges from 25 feet adjacent to the open space to 45 feet adjacent to Palisades Drive. The structure will not be significantly visible from the Santa Ynez Canyon trailhead located 600 feet from the site, along Vereda de la Montura, due to the topography of the trail. The surrounding trails at Topanga State Park, Trailer Canyon and Temescal Ridge are at a significantly higher elevation than the project site and thus, the project will not significantly impact public views. Although the proposed project would be the tallest

structure in the area adjacent to a City park, the Headlands' residential community was originally approved by the Commission with the understanding that the subdivision would permanently impact views in the once undeveloped area."

In other words, the neighbors' homes and the existing commercial uses *already* affected views of what a half century ago had been a pristine undeveloped area, so the one new building would not change the status quo significantly.

The staff concluded the proposed project would not have "any significant adverse impacts on coastal scenic resources" because it was located in "an area highly developed with residential and commercial uses. The proposed project incorporates landscaping and design features to minimize the visual mass of the structure adjacent to the City park."

The staff investigated and dismissed the arguments about hazards including fires, landslides, and geological instability.

The staff addressed effects on public recreation and the mountain trails that began near the site. The project would not compound parking problems. It had ample underground parking for a population that would not drive much, if at all. "[T]he project has been sited and designed to minimize impacts to public recreation and access to the surrounding trails."

The staff concluded "[t]he proposed development is compatible with the density, scale and character of the surrounding area . . . ." The question of the City's compliance with the California Environmental Quality Act did "not raise a substantial issue." The City's analysis found the project would be consistent with the Los Angeles Municipal Code, the Brentwood-Pacific Palisades Community Plan, and the Los Angeles County

13

Interpretive Guidelines.  The staff concluded this decisionmaking had "substantial legal and factual support."

The staff noted the Palisades area was short on housing for seniors "who no longer need or can afford the single-family homes that predominate in the area. . . .  [T]he project provides opportunities for seniors to live in an area otherwise only accessible by those who are mobile and affluent."

b

Los Angeles City Councilmember Mike Bonin wrote in support of the project.  "The proposed project will provide a much-needed community benefit with convenient, local residential care for seniors, allowing them to stay in the neighborhood and close to family.  The project has been thoughtfully designed in conformance with the California Coastal Act.  Its density and scale is comparable with the existing development in the surrounding neighborhood and the Commission has consistently determined that senior care facilities are an approved use on commercially zoned land in the Coastal Zone.  Additionally, the project conforms with the Brentwood-Pacific Palisades Community Plan by providing a transition between commercial and adjacent residential uses that surround the property on three of four sides.  I concur with Coastal Commission staff's recommendation that 'no substantial issue' exists regarding the proposed eldercare project."

c

Some input to the Commission from neighbors favored the project.  One resident wrote, for instance, that the project "is needed by the Pacific Palisades community.  My 94 year old mother is in an assisted living facility in Culver City because there are no suitable accommodations available in the Palisades.

14

Other members of the community have aging parents in facilities as far away as the West Valley and Ventura. This situation necessitates separation causing distress and inconvenience. As we all age it is imperative that residential facilities be available to maintain seniors within our community. The fact that this Project is located in an appropriately zoned area and fully compliant with size and height ordinances makes this Project especially appropriate. The community needs this facility."

Other supporters argued the project's "height, mass and design" would be "fully compliant with local regulations" and would be "visually compatible with the character with the surrounding area and will not further block views from public trails or roadways."

d

Opponents argued vociferously and at considerable length against the staff report.

For instance, one attorney contended the City's decision violated the Coastal Act by failing to minimize the risks to life and property from geologic, fire, and flood hazards and by failing to preserve scenic values. The project would dominate rather than be subordinate to its setting, and it would not serve visitors. It would violate density rules and would have an adverse and degrading effect on environmentally sensitive habitats. The City's decision failed to protect the neighborhood, failed to minimize the traffic impact, and failed to follow interpretative guidelines. The project was inconsistent with the local plan for the area. "Due to its aesthetics and overwhelming height and bulk, the Project would be in complete disharmony with all existing development."

Another attorney in opposition submitted a 31-page statement that included many complaints. For example, "The Project's Bloated Size and Towering Height Render It Manifestly Incompatible with the Vast Wilderness Parklands and Residences in the Surrounding Community."

There were many other submissions from opponents.

e

On July 11, 2018, nine members of the Coastal Commission held a public hearing and, afterwards, unanimously ruled the appeal presented no substantial issue.

The staff started the hearing by responding to the assertion by some neighbors that the approved development would degrade an environmentally sensitive habitat area. "[A]lthough the subdivision itself is surrounded by large, expansive areas of environmentally sensitive habitat areas, characterized primarily by chaparral and coastal sage scrub, and [r]iparian habitat areas, the subject site itself is entirely on an existing graded pad. And there is no native vegetation or sensitive habitat that would be affected by the structure itself." The staff likewise addressed and dismissed concerns about parking, traffic, and geology.

Lawyers for both sides then spoke.

An attorney reiterated the opponents' many objections: the importance of preserving parklands in the coastal zone, the project's harm to views from public trails, the adverse effects on traffic, the fire risk in this hazard zone, and the destruction of natural habitat. This attorney emphasized trailheads into the parkland were only 150 feet from the project, which would create grave parking problems. "And no view analysis has been done from any point on the trails . . . ." Counsel stressed the inadequacy of the project's parking analysis.

16

On the pro-project side, the developer's lawyer noted his client's extensive community outreach and the considerable local support for the project, including from the Pacific Palisades Chamber of Commerce and the Land Use Committee of the Palisades Community Council. "There's a demonstrated need for this project. . . . [M]ost of the residents with elder parents have to send them within an hour to two hours away, to other available facilities."

The staff responded to the complaints about the project's effect on views.

"The [view] analysis in the report focuses on where the project would have been visible from, primarily, some of those trails that are up to two miles away, the major trails in the area. And our view analysis was, when you're looking at it from those trails where the site would be visible, and so far away, and you're looking at the whole 800-unit subdivision, this is not going to present any sort of effect. ¶ The other trails that are in the City Park, or in the park, are at a lower elevation and probably only be visible from that one point near the trailhead. But [I would] point out that any structure would be visible there, and we think they've done a good job here of -- one, it's set back, the structure itself, from the edge. There's a parking -- their surface parking lot is located between the edge of the slope and the building. And then, the building does have some step-up in the upper stories. ¶ I think any building there would be somewhat visible, but we don't think that's going to be a significant impact, and it would only be visible from that very focused point of that trail."

A Coastal Commissioner commented, "I know that these projects are difficult, but I think this is an important project for the reasons stated by the applicant because housing for seniors,

17

especially in higher-income ZIP codes . . . is very difficult to site, even though it is an extremely needed service. . . . [W]hen families are trying to take care of their elderly parents or their elderly relatives, it really matters in terms of proximity, and particularly in those cases where you have family members who suffer from memory issues, who suffer from brain diseases such as dementia and Alzheimer's . . . . [This site] had been categorized as a commercial area, and also that when you looked at the surrounding neighborhood, that, in fact, it's densely developed, with tall structures. And I think, fortunately for the people who live in that area, they have the proximity to all those wonderful state parks and state trails. ¶ But that's not a reason . . . to deny elderly housing, which is something that is sorely needed in a lot of neighborhoods."

The Coastal Commission unanimously rejected the appeal as presenting no substantial issue.

6

On July 24, 2018, appellant Association sued the City of Los Angeles and the Coastal Commission. The amended pleading was filed December 12, 2018. This operative pleading challenges the approval of the project by the City and the Coastal Commission. The first count is "error and abuse -- unsupported findings" under the Coastal Act. The second charges a violation of the California Environmental Quality Act. The third count is "error and abuse -- no fair hearing."

On April 21, 2020, the trial court denied the neighbors' writ petition in an 18-page statement of decision. It began by rejecting the neighbors' challenge to the City's grant of Class 32 categorical exemption for the eldercare project. The court found the project was zoned C-1, which allows for commercial uses and,

specifically, eldercare facilities. The court found the project combined residential and commercial components and was consistent with the area's community plan.

The trial court examined and rejected each of the neighbors' complaints. The court found substantial evidence supported the City's findings that the project would not have an adverse effect on traffic, noise, scenic views, aesthetics, or threatened species. The City had properly considered relevant guidelines. The court found the neighbors had enjoyed a full and fair opportunity to present their evidence to the Coastal Commission and rejected their claims about Coastal Act violations. The court entered judgment against the Association on June 2, 2020.

II

In three chapters, we affirm the trial court's sound ruling. The first chapter concerns the Los Angeles *zoning* code. This discussion is an unfortunately intricate excursion through a detailed statute. The second chapter is about the neighbors' claim the *City* did not adequately evaluate the project's compatibility with the neighborhood. The third weighs the attack on the *Coastal Commission*'s decision.

Before embarking on these three chapters, we note the respondents argue, citing *Meinhardt v. City of Sunnyvale* (2022) 76 Cal.App.5th 43, 58, [291 Cal.Rptr.3d 250], review granted on issue of dismissal of untimely appeal June 15, 2022, S274147, that they win without any need to reach the merits. Because our Supreme Court granted review of *Meinhardt* and because our analysis shows the respondents indeed do win on the merits, we will assume without deciding that *Meinhardt* was wrongly decided. Whether our assumption is right or wrong, the

19

respondents defeat this appeal and the trial court's judgment stands. This issue thus does not matter here and will detain us no further.

A

The neighbors devote the bulk of their opening appellate brief to one issue: whether the proposed building is bigger than the Los Angeles zoning code allows. In this section, our summary citations are to the Los Angeles Municipal Code (<https:// codelibrary.amlegal.com/codes/los_angeles/latest/lamc/0-0-0-107363> (as of March 6, 2023), archived at <https://perma.cc/ 5LXL-MJ59>.) This Code defines a lot's "buildable area" partly in terms of "yard" space, so much of this discussion refers to yard requirements. (See *id.* at § 12.03.)

This zoning controversy boils down to one sentence in the law: section 12.22.A.18(c)(3). (That citation is forgettable, but later it will pay to remember it, because it is central to our discussion.) We quote that decisive sentence, omitting superfluous words and adding italics and bracketed numbers:

"No yard requirements shall apply to the residential portions of buildings located on lots . . . [1] used for *combined commercial and residential uses*, if [2] such *portions are used exclusively for residential uses*, [3] *abut a street*, private street or alley, and [4] the first floor of such buildings at ground level is used for *commercial uses* or for access to the residential portions of such buildings." (§ 12.22.A.18(c)(3).)

We shall refer back to this quoted sentence, so again we beg the reader to keep it in mind.

The trial court correctly ruled this provision means *no* yard requirements applied to the residential portions of the eldercare facility. That holding wins the day for the project.

20

The eldercare project satisfies each of the four bracketed elements.

1. The lot would be "used for *combined commercial and residential uses*." A ground floor bistro would be open to the public. Because the public would be able to dine there, that operation would be *commercial*. The rooms where residents sleep would be private and *residential*. The building therefore *combined commercial and residential uses*.

2. The building would have *portions that are exclusively residential*. The neighbors do not dispute the individual rooms where elders sleep would be exclusively residential.

3. The residential portions of the building would *abut streets*: Palisades Drive to the east and Vereda De La Montura to the north. The neighbors do not contest this.

4. The first floor would be used for *commercial uses*: the public bistro would be a commercial operation.

The conclusion is simple: no yard requirements apply here. This demolishes the opponents' zoning argument.

The neighbors dispute this plain English interpretation of the zoning code for five reasons. These five arguments fail under any standard of review.

1

***First***, the neighbors argue this provision has no application to the eldercare facility because a different section of the zoning code—namely section 12.13.A.2(a)(31)—specifically allows an eldercare facility to be built at this locale.

This argument is illogical because these two sections do not conflict. A specific authorization of an eldercare facility is consistent with a general yard exception for combined use buildings. The two provisions have different functions: the latter pertains to yard requirements; the former does not. A mention in one place does not imply exclusion in another. To think otherwise is a fallacy.

Consider a parallel example. Suppose one law allows fishing in mountain lakes. A separate law establishes the minimum fish size for keepers. The laws are different and consistent. That is the situation here. The inference the neighbors press is spurious.

We explain in more detail. The prolixity of the zoning numbering scheme is daunting because six signifiers are a lot, but keep in mind the two provisions are section 12.22.A.18(c)(3), quoted above, and section 12.13.A.2(a)(31), which we quote here:

*SEC. 12.13. "C1" LIMITED COMMERCIAL ZONE.*

*The following regulations shall apply to the "C1" Limited Commercial Zone:*

*A. Use – No . . . building or structure shall be erected, . . . except for the following uses . . . : . . .*

*2. . . . The following . . . businesses . . . :*

*(a) Types of Uses: . . .*

*(31) Eldercare Facility.*

Section 12.13.A.2(a)(31) thus authorizes eldercare facilities in a particular zone.

Section 12.13.A.2(a)(31) and 12.22.A.18(c)(3) are different in purpose and are consistent. The former authorizes uses, including eldercare facilities. The latter regulates yards. It is

like the mountain lakes and the fish size. The suggestion that one section constrains the other is unfounded.

In sum, the neighbors' first argument fails.

2

**Second**, the neighbors fasten on the word "lots" in section 12.22.A.18(c)(3), which we quoted above. Their argument involves other subdivisions of this same section (subdivisions (a) and (b)).

We quote material words of those subdivisions, as well as the now familiar subdivision (c)(3). (There are many pertinent subdivisions; we mark this quotation with italics instead of quotation marks.)

*18. Developments Combining Residential and Commercial Uses. . . . [T]he following uses shall be permitted: . . .*

*(a) Any use permitted in the R5 Zone on any lot in the CR, C1, C1.5, C2, C4 or C5 Zones . . . . Any combination of R5 uses and the uses permitted in the underlying commercial zone shall also be permitted on such lot.*

*(b) Any use permitted in the CR, C1, C1.5, C2, C4 or C5 Zones on any lot in the R5 Zone provided that the lot is located within the Central City Community Plan Area. Any combination of these commercial and residential uses shall also be permitted on the lot. Commercial uses or any combination of commercial and residential uses may be permitted on any lot in the R5 Zone by conditional use pursuant to Section 12.24 W.15. outside the Central City Community Plan Area.*

*(c) Yards. Except as provided herein, the yard requirements of the zone in which the lot is located shall apply . . . .*

*(3)   No yard requirements shall apply to the residential portions of buildings located on lots in the CR, C1, C1.5, C2, C4, and C5 Zones used for combined commercial and residential uses, if such portions are used exclusively for residential uses, abut a street, private street or alley, and the first floor of such buildings at ground level is used for commercial uses or for access to the residential portions of such buildings.*  (<u>SEC. 12.22. EXCEPTIONS.</u>)

The neighbors argue the exception to yard requirements in subdivision (c)(3) has no application to *this* lot, because the lot is not in one of the exceptions allowed in subdivisions (a) or (b), and because an eldercare facility is a use already allowed in the C1 zone.

The statutory words show no inconsistency exists between the language about lots in the various subdivisions.  All three subdivisions are permissive.  The neighbors' argument is untenable.

3

***Third***, the neighbors argue the ground floor bistro will not be open to the public and therefore the first floor of this building would not, in the language of the statute, be "used for commercial uses."  (<u>§ 12.22.A.18(c)(3)</u>.)  This open-to-the-public question is one of fact.

Where the dispute is factual in character, the law requires the trial court to defer to the agency's factfinding, which compels upholding its decision even though an opposite conclusion would have been equally or more reasonable.  The court's task in this setting is neither to weigh conflicting evidence nor to determine who has the better argument.  (*Vineyard Area Citizens for*

24

*Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40
Cal.4th 412, 435.)

The developer and the City made offers of proof about this
fact in the trial court.  The neighbors' opening appellate papers
do not cite any pertinent objection they raised to this offer.  This
omission forfeits appellate challenge to this proffered fact.  In a
bench trial, the trial judge is entitled to take an unchallenged
proffer as something that does not require further trial time,
which is always scarce.  If the neighbors wanted to take factual
issue with this point, the place to do it was at trial.

4

***Fourth***, the neighbors argue the ground floor is not
"exclusively" residential.  The statute, however, does not require
that the first floor be "exclusively residential."  The statutory
words demonstrate this.  With our emphasis, the statute creates
an exception that applies when the residential portions of the
building "are used *exclusively* for residential uses, abut a street,
private street or alley, and the first floor of such buildings at
ground level is used for commercial uses or for access to the
residential portions of such buildings."    (§ 12.22.A.18(c)(3).)  The
word "exclusively" modifies "residential uses" only, not the rest of
the sentence. The residential uses indeed are exclusively
residential:  the residential rooms are residential only.  The first
floor is used for commercial uses:  there is a public bistro there.
This argument thus founders by misreading the statute.

5

***Fifth***, the neighbors argue about evidence they did not
present to the trial court and that is not in the record. We deny
their motion for judicial notice.  (See *Western States Petroleum
Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573, fn. 4 ["it would

never be proper to take judicial notice of evidence that (1) is absent from the administrative record, and (2) was not before the agency at the time it made its decision."]; *Pulver v. Avco Financial Services* (1986) 182 Cal.App.3d 622, 632 ["As a general rule, documents not before the trial court cannot be included as part of the record on appeal and thus must be disregarded as beyond the scope of appellate review."].)

The neighbors make two different claims in their motion for judicial notice.

a

The neighbors first say they did not present the extra-record evidence to the trial court because the City "came up with an interpretation at trial that referenced the dates of adoption of amendments to subsections of that Code section that was incorrect, and research was appropriate to aid in interpretation of the entire section."

The City responds that this allegation about its supposedly new interpretation is "simply false."

We need not resolve when the City proposed its interpretation, for—whenever the City proposed it—the neighbors' time to research this trial issue was before *or during* trial. In this bench trial, the neighbors did not ask the trial court for a recess for research. Nor do the neighbors suggest it would have been futile to make this request to the trial court. To show it is futile to object, counsel must show it is costly to assert your rights. (E.g., *People v. Hill* (1998) 17 Cal.4th 800, 820–822.) The neighbors do not attempt this endeavor. This argument collapses.

///

///

26

b

Based on different extra-record material, the neighbors claim the City *falsely* told the trial court that, in the future, the City would review the interior floor space issue on a robust record. The neighbors maintain we therefore should rule on matters about which they request judicial notice to avoid "judicial waste and needless proceedings." The neighbors contend that forcing them to appeal the post-judgment matters in a separate proceeding would be "a significant waste of judicial resources" and would cost courts and the parties "untold tens of thousands of dollars."

We decline this unprecedented invitation to attempt to moot a future appeal in the name of judicial economy.

As authority for their proposal, the neighbors cite *Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 813 (*Reserve*). But *Reserve* noted that "[i]t is an elementary rule of appellate procedure that, when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered. [citation omitted] This rule preserves an orderly system of appellate procedure by preventing litigants from circumventing the normal sequence of litigation." (*Ibid.*) It is true the *Reserve* opinion departed from this usual rule—in a situation about which there was no possibility of factual dispute. (*Ibid.*) That situation hardly obtains here, where the neighbors are charging the developer made false statements to the trial court and manipulated City zoning officials to produce a mere "shadow-play." The developer and the City dispute these claims.

The neighbors cite two other cases that are equally inapplicable. *In re Zeth S.* (2003) 31 Cal.4th 396, 413 rejected

27

appellate consideration of postjudgment evidence.  And *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, footnote 3, denied a motion to take judicial notice of post-judgment evidence.

We thus apply *Reserve*'s "elementary rule of appellate procedure" and deny the neighbors' motion for judicial notice. (*Reserve, supra*, 30 Cal.3d at p. 813.)

In sum, the neighbors' first appellate argument fails.

B

The neighbors' second appellate attack is on the City's decision to grant the project a "Class 32 Categorical Exemption." The non-specialist may wonder what this means.  We explain in three steps.  First, we review law familiar to land use experts but less familiar to others.  Second, we state the standard of review. Third, we review and reject the neighbors' two complaints:  the project will be architecturally incompatible with the neighborhood, and the project will spoil the view.

1

We set the stage by summarizing some law.

A "Class 32 Categorical Exemption" is a term of art under the California Environmental Quality Act.  We offer a brief summary of that famous statute.  Then we sketch portions of the California Coastal Act.  In this section of our opinion, statutory citations are to the Public Resources Code.

a

The California Environmental Quality Act is often called CEQA, a convention we reluctantly follow because it is convenient in this case of many statutes.  (§ 21000 et seq.)

Our state enacted CEQA in 1970.  That landmark year of broadening environmental awareness saw the first Earth Day,

the passage of the National Environmental Policy Act, and the advent of the federal Environmental Protection Agency.

Since then, CEQA has embodied California's central policy of requiring governmental entities to give major consideration to preventing environmental damage.  (*County of Butte v. Department of Water Resources* (2022) 13 Cal.5th 612, 626.)

CEQA is a legislatively imposed directive specifying how state and local agencies will exercise discretion over land use decisions.  (*Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 712.)

CEQA review is undertaken by a lead agency, defined as "the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment."  (§ 21067.)

CEQA aims to inform the public and government decision makers about the potential environmental effects of proposed activities.  Its statutory scheme created a tiered system of environmental analysis to match the likelihood and magnitude of possible environmental damage.  The most elaborate CEQA analysis is the environmental impact report:  the so-called EIR.  An environmental impact report must give decisionmakers what they need to take appropriate account of environmental consequences.  The report is also a document of accountability.  It must arm those outside the approval process with an accessible and empowering document.  If people disagree with the proposed project, the report is to help them respond accordingly.  (*Laurel Heights Improvement Assn. v. Regents of Univ. of California* (1988) 47 Cal.3d 376, 392.)

Environmental impact reports can be elaborate, as well as very expensive and time-consuming, and are appropriate when exacting environmental assessment is appropriate.

Common sense, however, tells us "that the majority of private projects for which a government permit or similar entitlement is necessary are minor in scope—e.g., relating only to the construction, improvement, or operation of an individual dwelling or small business—and hence, in the absence of unusual circumstances, have *little or no effect on the public environment.*" (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1100 (*Berkeley Hillside*), quoting *Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 272, italics added.)

When it is likely there will be *little or no effect on the public environment*, the lead agency—here, the City of Los Angeles—may conclude the project is exempt from CEQA if the project passes five tests.

These five tests comprise the aforementioned Class 32 categorical exemption.

We italicize the five words at issue here:

1. The project is consistent with the applicable general plan designation and *all applicable general plan policies* as well as with applicable zoning designation and regulations.
2. The proposed development occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses.
3. The project site has no value as habitat for endangered, rare, or threatened species.

4. Approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality.

5. The site can be adequately served by all required utilities and public services. (Cal. Code Regs., tit. 14, § 15332, italics added; see generally *Berkeley Hillside, supra*, 60 Cal.4th at pp. 1092–1102 [explaining origin, authority, and stature of CEQA regulations and guidelines].)

This CEQA exemption is sometimes called the in-fill development projects exemption, the Class 32 categorical exemption, or some similar combination of words. (See, e.g., *Protect Tustin Ranch v. City of Tustin* (2021) 70 Cal.App.5th 951, 956–964.)

b

We now turn to the Coastal Act (§ 30000 et seq.), which governs land use planning for California's coastal zone. (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 793 (*Palisades Bowl*).)

The Coastal Act promulgated policies governing development in the coastal zone that are called "Chapter 3" policies. (§§ 30200–30265.5.)

Under the Coastal Act, local governments and the Coastal Commission share responsibility for coastal planning. Local governments may prepare local coastal programs within their jurisdictions' coastal zones. (§ 30500.) The City of Los Angeles does not have a certified local coastal program and has instead exercised its option to issue such permits under section 30600(b).

In certain coastal areas of the City closest to or along the sea known as dual permit jurisdictions, proposed development

31

requires permits from both the City and the Commission.
(§ 30601; *Palisades Bowl, supra,* (2012) 55 Cal.4th at 794; Cal.
Code Regs., tit. 14, § 13301, subd. (a).)  For projects located
inland of the areas identified in section 30601, known as "single
permit jurisdiction" areas, proposed development requires a
coastal development permit only from the City.  However, the
permits the City issues in single permit jurisdictions are
appealable to the Commission.  (§ 30602.)

This eldercare project is within a single permit jurisdiction
in the City.

Appeals of City permit decisions to the Commission
initially require the Commission to determine whether the appeal
raises a "substantial issue" as to the project's conformity with
Chapter 3 of the Coastal Act.  (§ 30625, subd. (b)(1).)

If the appeal fails in this regard, as here, that is the end of
the line.  (§§ 30625, subd. (b)(1)), Cal. Code Regs., tit. 14, § 13115,
subd. (b).)

2

We review the City's factual findings of consistency with
general and community plans under the substantial evidence
standard.  (See *Holden v. City of San Diego* (2019) 43 Cal.App.5th
404, 410 (*Holden*).)

The neighbors agree the substantial evidence standard
applies to this inquiry.

This deferential standard means that, when a city approves
a proposed development as consistent with its general plan,
reviewing courts defer to that approval as an extension of the
entity's unique competence to interpret its own policies.  If the
city has followed proper procedures, courts must defer to the
city's decision *unless no reasonable person could have reached the*

32

*same conclusion.* (*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 154–155 (*Orange Citizens*).)

This case aptly illustrates the wisdom of this deferential standard. Opponents of the project see an eyesore threatening their beautiful neighborhood by the park; the blight will detract from splendid views. Supporters perceive a needed facility that will mesh with their locale; for them, the proximity is an advantage and not a curse.

These heartfelt and honorable disagreements turn in considerable measure on aesthetic judgments. That creates a problem for courts.

"Aesthetics are subjective." (*Georgetown Preservation Society v. County of El Dorado* (2018) 30 Cal.App.5th 358, 363 (*Georgetown*).)

The law tries hard to steer clear of subjectivity.

How can a community resolve these disagreements that involve clashes of aesthetic judgment?

"Once a general plan is in place, it is the province of elected city officials to examine the specifics of a proposed project to determine whether it would be 'in harmony' with the policies stated in the plan. [Citation.] It is, emphatically, *not* the role of the courts to micro-manage these development decisions." (*Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 719 (*Sequoyah*).)

The question is whether a reasonable person could agree with the City's conclusion that adding this urban building to this urban area was compatible with the plan for Brentwood and Pacific Palisades. (*Orange Citizens, supra*, 2 Cal.5th at pp. 154–155 [if the city has followed proper procedures, courts must defer

to the city's decision *unless no reasonable person could have reached the same conclusion*].)

The answer is yes:  the City's decision was eminently reasonable, as the next section explains.

3

The neighbors fault the City's decisionmaking on architectural compatibility and views.  We address each topic in turn.

Architectural compatibility is pertinent, the neighbors say, according to this four-step analysis:

1. The City granted the project a Class 32 categorical exemption from CEQA.
2. This exemption has five requirements, one of which requires consistency between the project and *all applicable general plan policies*.  (We previously quoted these requirements and italicized these words.)
3. The Brentwood-Pacific Palisades Plan set forth the objective of protecting "the character and scale of existing residential neighborhoods."
4. There is no architectural compatibility because the "size, design, and mass of the building are completely divorced from the character of the community's buildings and uses."

The neighbors conclude that "the Categorical Exemption cannot be applied."  They use similar logic about views.

This argument fails because substantial evidence supports the City's finding of compatibility between the project and the neighborhood.

34

The City found the "site and surrounding area are urbanized areas."

Up till now, in these proceedings the neighbors vigorously contested the factual description of their subdivision as "urbanized." In this court they no longer press this disagreement, and for good reason. The record shows this neighborhood has been a subdivision of Los Angeles for many decades. True, there are nearby public parks and open space, which no doubt is a lovely aspect of the neighborhood. But Pacific Palisades and Brentwood are not undeveloped seashores or wildernesses far from roads and other marks of human activity. They are subdivisions of the second largest city in America.

The urbanized character of this site and the surrounding area thus are facts unchallenged in our court.

The City had an ample basis for finding the architectural character of this proposed building is compatible with an urbanized area and with the community plan for Brentwood and Pacific Palisades. The architectural drawings of the proposed building alone are substantial evidence on this score. They reveal a typical urban building.

The neighbors urge closer scrutiny. Without saying so explicitly, the neighbors effectively argue for *mandatory architectural uniformity*. We illustrate how this is true.

Opponents decried the "modern, unattractive, flat-roof design of the Project, with an array of elevator shafts, staircases, and HVAC equipment towering up an additional 10 to 12 feet higher' and called it "completely out of character with the Mediterranean and rustic designs of the residential projects and the small commercial project that are proximate to the Site --

35

where all rooftop appurtenances are placed out of sight, beneath sloping rooflines."

Elsewhere in the record neighbors called the proposed building a "monstrous eyesore," a "white elephant," and "large and unsightly."

Their opening appellate brief echoes these concerns by posing this contrast.

"The entire subdivision consists of one and two-story homes and two and three-story townhomes no higher than 36 feet, the vast majority of which are built in a Mediterranean or rustic style with pitched roofs. In contrast, as can be seen from [the developer's] own filings, the planned eldercare building will be a 45 foot high (not including 10-12 foot stairway and elevator extensions above the roof), four-story, flat-roofed, largely glass and metal structure. . . . The size, design, and mass of the building are completely divorced from the character of the community's buildings and uses."

This argument for mandatory architectural uniformity misapplies the substantial evidence standard of review, where we inquire whether evidence supports the agency's decisionmaking. We do not reweigh evidence. Elected officials have latitude to weigh competing and subjective notions of beauty and blight. Our judicial role in this setting is to defer to their judgment when, as here, substantial evidence supports it.

As for views from park trails and elsewhere, the record again supplies substantial evidence for finding the project to be exempt from the California Environmental Quality Act. The neighbors anchor their argument to the community plan's policy of preserving and protecting views from hillsides, public lands, and roadways.

36

The record shows, however, that the major intrusions on the views of nature from high trails in the public parks are the hundreds of existing buildings in the neighbors' subdivision. As one approaches the proposed facility, it becomes more visible, as do surrounding urban structures. The existing views are of an urban neighborhood against a backdrop of open space. The City was entitled to conclude that adding another urban building to this urban setting was compatible with the Brentwood-Pacific Palisades plan.

Again, the neighbors implicitly argue for architectural uniformity. They suggest that views of *this* building are uniquely odious. But substantial evidence supported the City's determination that this typical urban building was compatible with existing views in this urban neighborhood.

The neighbors' opening brief cited three decisions, but none involved architectural incompatibility or preservation of views. In *Holden, supra*, 43 Cal.App.5th at pp. 411–420, the issue was residential density. The *Holden* decision upheld a municipal decision on a density issue. In *Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 788, the issue was parking. In *San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley USD* (2006) 139 Cal.App.4th 1356, 1368, the issue was the decision to close two elementary schools. These decisions are inapposite.

The neighbors also cite *Georgetown*, *supra*, 30 Cal.App.5th 358 but that case applied a different standard of review than the one governing this appeal. There a county issued a "mitigated negative declaration." (*Id.* at pp. 364, 366, 369.) This procedure triggered what the Court of Appeal described as an "unusual" and nondeferential "fair argument" standard of review. (*Id.* at p.

37

370.) The *Georgetown* decision distinguished situations where "planning or zoning determinations are reviewed with greater deference, both because the public entity is deemed best able to interpret its own rules and because it is presumed to bring local knowledge and experience to bear on such issues." (*Id*. at p. 371.) This latter standard, which the *Georgetown* opinion did not apply, is the pertinent law for this case. Because the *Georgetown* opinion is distinguishable, we engage it no further.

We repeat that "[o]nce a general plan is in place, it is the province of elected city officials to examine the specifics of a proposed project to determine whether it would be 'in harmony' with the policies stated in the plan. [Citation.] It is, emphatically, *not* the role of the courts to micro-manage these development decisions." (*Sequoyah, supra,* 23 Cal.App.4th at p. 719.)

This standard defeats the neighbors' second attack on the trial court's decision. A reasonable person could have reached the same conclusion as the City: that this proposal for an urban building is compatible with the plans for this urban area.

C

The neighbors' third and final appellate attack is on the Coastal Commission's decision. The Coastal Commission decided the neighbors' appeal presented no substantial issue under the Coastal Act.

The same deferential standard of review governs this analysis as well. It was for the Commission to weigh conflicting evidence; we may reverse only if a reasonable person could not have reached the same conclusion. (*Lindstrom v. California Coastal Com.* (2019) 40 Cal.App.5th 73, 93.)

The neighbors again misunderstand the standard of review. They offered what they say is substantial evidence in support of *their* many complaints about the eldercare proposal. But this mistakes the question. The question is not whether the neighbors presented evidence supporting their objections. Rather, the question is whether the Commission had a substantial basis for deciding as it did. The answer is yes. Reasonable people could agree with the Commission's findings that the City's substantive decision on the merits of the eldercare project enjoyed "factual and legal support." (*Hines v. California Coastal Com.* (2010) 186 Cal.App.4th 830, 846, fn. 11, 849, 850.)

Now using the Coastal Act as their fulcrum, the neighbors repeat their complaints that the project would be visually incompatible with their neighborhood. (See Pub. Resources Code § 30251 [development shall be sited and designed to protect views to and along the ocean and scenic coastal areas and to be visually compatible with the character of surrounding areas].)

These arguments in substance are the same as the objections about architecture and views that we just rejected. As we explained, substantial evidence supports the City's decision, and it supports the Commission's decision too.

The neighbors cite *Douda v. California Coastal Com.* (2008) 159 Cal.App.4th 1181, 1200, which held the Coastal Commission has authority to regulate scenic and visual resources within the coastal zone, even when the site is four miles from the coast. That authority is not in dispute here. The Commission ruled against the neighbors because the content of the neighbors' appeal did not raise a substantial issue. *Douda* is irrelevant.

The neighbors raise traffic issues. The Coastal Commission and the City relied on a traffic study estimating the eldercare

39

facility would "generate a nominal increase in trips, approximately 260 daily trips or 14 AM peak-hour trips or 21 PM peak-hour trips . . . ." This study concluded the project would not have a significant effect on nearby intersections. The neighbors criticize this study, which is a misguided request for us to reweigh evidence.

The neighbors raise the specter of a parking calamity, but the Commission concluded the nominal increase in traffic would not significantly displace street parking for hikers bound for the trails. The eldercare facility would, after all, include underground parking. This logic is sound. Substantial evidence supports the Commission's and the City's decisions.

The neighbors point to "Regional Interpretive Guidelines" the Coastal Commission apparently adopted in 1980 for Los Angeles County. On the first page, this Guidelines document states the "guidelines should assist in applying various Coastal Act policies to permit decisions; they in no case supersede the provisions of the Coastal Act nor enlarge or diminish the powers or authority of the Commissions or other public agencies."

These guidelines do not diminish the powers or authority of the Coastal Commission. The neighbors cite no case for their claim that these guidelines can be used to overturn a Commission decision. The neighbors' opening brief does not supply an adequate legal analysis explaining this proposed result. We will not overturn the Commission's decision on this basis.

///

///

///

///

///

40

## DISPOSITION

We affirm the judgment and award costs to the respondents.  The motion to take judicial notice is denied.


WILEY, J.

We concur:


STRATTON, P. J.


VIRAMONTES, J.