Filed 9/5/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| COASTAL PROTECTION ALLIANCE INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> AIRBNB, INC., et al., <br><br> Defendants and Respondents. | B317485 <br><br> (Los Angeles County Super. Ct. No. 20STCV44675) |

APPEAL from a judgment of the Superior Court of Los Angeles County, David Sotelo, Judge.  Affirmed.

Tucker Ellis, Michael C. Zellers, Peter L. Choate, Amanda Villalobos and Benjamin C. Sasse for Plaintiff and Appellant.

McDermott Will & Emery, Russell Hayman, Jon S. Dean, Jason D. Strabo, and Sarah P. Hogarth for Defendants and Respondents.

—————————————————

**INTRODUCTION**

Airbnb, Inc. and Airbnb Payments, Inc. (collectively Airbnb) is an online marketplace that connects owners of short-term rentals (STRs) with renters seeking accommodations for 30 days or less. Among Airbnb's many rental listings are properties within California's coastal zone. The Coastal Protection Alliance (CPA) brought this action against Airbnb for violations of the Coastal Act, alleging that STRs in the coastal zone are "developments" that require a coastal development permit (CDP), and that Airbnb was directly and vicariously liable for allowing STR owners to list and rent unpermitted STRs on its website.

CPA appeals from a judgment following an order granting Airbnb's demurrer without leave to amend. We hold that STRs are not per se developments under the Coastal Act, and accordingly affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.     Facts[1]**

CPA is a nonprofit corporation based in San Bernardino, California, that states its mission is to protect and preserve the California coast.

Airbnb owns and operates an online marketplace for STRs. The site works by connecting property owners, known as Member Hosts, with prospective guests seeking accommodations. Airbnb monetizes its service by charging the Member Hosts and their guests a fee based on a percentage of the cost of the STR. It also collects applicable taxes and manages remittances to local governments.

---

[1]     Our factual recitation is drawn from the complaint's allegations and the applicable statutes.

As relevant to this case, the Coastal Act defines a development as a "change in the density or intensity of use of land" and a "change in the intensity of use of water, or of access thereto." (Pub. Resources Code, § 30106.)[2] The gravamen of CPA's complaint is that STRs in the coastal zone, including those offered for rent on Airbnb's site, are developments under the Coastal Act that require a CDP. CPA alleges that "STRs increase the density and intensity of use of land in the Coastal Zone by increasing access to homes and residential investment properties by the guests who rent them and by increasing access to the coastline by such guests." CPA further alleges that "STRs . . . increase the intensity of use of water and access thereto in the Coastal Zone because guests use water when they stay in STRs and have increased access to the coastline."

Thousands of STRs offered on the Airbnb marketplace are located within the coastal zone. Airbnb has neither applied for a CDP for any STR located in the coastal zone nor advised its Member Hosts of an obligation to do so. Airbnb also does not ensure that Member Hosts have procured a CDP prior to listing their property on the Airbnb website. CPA alleges that Airbnb "knows or should know that it and its Member Hosts are not complying with the CDP requirement under the Coastal Act and that any STR for which a CDP has not been obtained is illegal." CPA further alleges that by facilitating rentals of these STRs, Airbnb is engaging in development that requires a CDP. It also alleges that Airbnb, through its conduct and policies, has conspired with the Member Hosts to violate the Coastal Act, and

---

[2] All undesignated statutory references are to the Public Resources Code.

3

has also formed a joint venture and agency relationship with the various Member Hosts.

CPA alleges these Coastal Act violations entitle it to declaratory and injunctive relief and render Airbnb liable for civil penalties.

## II. Airbnb's Demurrer and Request for Judicial Notice

Airbnb demurred to the complaint, asserting that STRs are not per se developments, Airbnb did not engage in development by listing STRs in the coastal zone, and that even if STRs were developments it would not be vicariously liable for the Member Hosts' failure to obtain CDPs. It also argued that the court should decline jurisdiction under the doctrine of primary jurisdiction. The trial court issued a tentative ruling indicating it would overrule the demurrer, held an initial hearing, and then continued the matter for further hearing. In the interim, Airbnb moved to file supplemental briefing and requested judicial notice of Coastal Commission materials. These materials included staff reports, later formally adopted by the Coastal Commission, which addressed proposed amendments to local coastal programs in the City of Trinidad and the City of Eureka (the Trinidad and Eureka Reports). In both instances the Coastal Commission adopted staff findings that determined that STRs were not developments that required a CDP.

On July 13, 2021, the court held a hearing, informed the parties that it was intending to invoke the primary jurisdiction doctrine and asked them to submit proposed questions to the Coastal Commission. On August 4, 2021, after it received the parties' respective proposed questions, the court found that STRs are not developments and entered an order sustaining Airbnb's demurrer. The court also granted Airbnb's motion for judicial

4

notice of the Trinidad and Eureka Reports, invoked the primary jurisdiction doctrine, and stayed the action pending referral to the Coastal Commission.

CPA moved to clarify the "purpose and scope" of the court's referral to the Coastal Commission in light of the court's conclusion STRs are not developments under the Coastal Act. After a hearing on the motion, the court withdrew its referral to the Coastal Commission and sustained the demurrer without leave to amend. CPA timely appealed.

## DISCUSSION

### I.    Standard of Review

We review an order sustaining a demurrer de novo. (*Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016) 1 Cal.5th 994, 1010.) "[W]e accept the truth of material facts properly pleaded in the operative complaint, but not contentions, deductions, or conclusions of fact or law. We may also consider matters subject to judicial notice. [Citation.]" (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 924.) When the trial court sustains a demurrer "without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

### II.    The Coastal Act

"The Coastal Act of 1976 . . . was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California." (*Yost v. Thomas* (1984) 36 Cal.3d 561, 565 (*Yost*).) In doing so, the

5

Legislature found that " ' "the California coastal zone is a distinct and valuable natural resource of vital and enduring interest to all the people;" that "the permanent protection of the state's natural and scenic resources is a paramount concern;" that "it is necessary to protect the ecological balance of the coastal zone" and that "existing developed uses, and future developments that are carefully planned and developed consistent with the policies of this division, are essential to the economic and social well-being of the people of this state . . . ." ' " (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 793–794 (*Pacific Palisades*).)  The Coastal Act identifies its "basic goals" to include protecting the coast and maximizing public access to it.  (§ 30001.5.)  "We liberally construe the Act to achieve these ends."  (*Keen v. City of Manhattan Beach* (2022) 77 Cal.App.5th 142, 145 (*Keen*); § 30009.)

*Local Coastal Programs* (*LCPs*)

"The Coastal Act expressly recognizes the need to 'rely heavily' on local government '[t]o achieve maximum responsiveness to local conditions, accountability, and public accessibility . . . .' " (*Pacific Palisades*, *supra*, 55 Cal.4th at p. 794; § 30004, subd. (a).)  As relevant here, it requires local governments to develop LCPs, which include "(a) land use plans, (b) zoning ordinances, [and] (c) zoning district maps, . . . which, when taken together, meet the requirements of, and implement the provisions and policies of, [the Coastal Act] at the local level." (§ 30108.6.)  "If it conforms to the Act's policies, the Commission certifies the program.  [Citations.]" (*Keen*, *supra*, 77 Cal.App.5th at p. 145; see also *Yost*, *supra*, 36 Cal.3d at p. 566.)  "Once the California Coastal Commission certifies a local government's program, and all implementing actions become effective, the

commission delegates authority over coastal development permits to the local government. [Citations.]" (*Pacific Palisades*, *supra*, 55 Cal.4th at p. 794.)

*Coastal Act's Definition of "Development"*

Subject to narrow exceptions, any person "wishing to perform or undertake any development in the coastal zone . . . shall obtain a coastal development permit" in addition to obtaining any other permit required by law. (§ 30600, subd. (a).) The Coastal Act defines " '[d]evelopment' " to mean "on land, in or under water, the placement or erection of any solid material or structure; discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; grading, removing, dredging, mining, or extraction of any materials; change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act . . . and any other division of land, including lot splits, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use; change in the intensity of use of water, or of access thereto; construction, reconstruction, demolition, or alteration of the size of any structure, including any facility of any private, public, or municipal utility; and the removal or harvesting of major vegetation [subject to specific exceptions]." (§ 30106.)

*Standing*

The Coastal Act "gives '[a]ny person' standing to maintain an action to enforce duties specifically imposed upon the Commission or a local governmental agency by the Coastal Act." (*Hagopian v. State of California* (2014) 223 Cal.App.4th 349, 373.)

## III. STRs Are Not Per Se Developments Under the Coastal Act

With this background in mind, we turn to CPA's contention that STRs in the coastal zone are " 'developments' under the Coastal Act for which CDPs must be obtained."

" 'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.' [Citation.] 'We begin by examining the statutory language, giving it a plain and commonsense meaning. [Citation.] We do not, however, consider the statutory language in isolation; rather, we look to the entire substance of the statutes in order to determine their scope and purposes.' " (*Skidgel v. California Unemployment Ins. Appeals Bd.* (2021) 12 Cal.5th 1, 14.) Our Supreme Court has also provided guidance, explaining that courts are to construe "development" expansively, "consistent with the mandate that the Coastal Act is to be 'liberally construed to accomplish its purposes and objectives.' " (*Pacific Palisades*, *supra*, 55 Cal.4th at p. 796.) It is thus well-established that "the Coastal Act's definition of 'development' goes beyond 'what is commonly regarded as a development of real property.' " (*Ibid.*)[3]

---

[3] While we agree that courts have interpreted development expansively, we also note that several of the cases cited by CPA in support of that proposition do not pertain to the specific portion of the definition of development at issue here. (See, e.g., *Spencer v. City of Palos Verdes Estates* (2023) 88 Cal.App.5th 849, 869 [holding that an organized scheme of harassment could constitute a development if it resulted in a " 'change in the intensity of use of water, or of access thereto' "]; *Surfrider Foundation v. Martins Beach 1, LLC* (2017) 14 Cal.App.5th 238,

8

As relevant here, a development is defined to include a "change in the density or intensity of use of land." (§ 30106.) CPA argues that "development occurs under the Act when residential property is allowed to be used in such a manner as to increase access to the property, thereby resulting in a change in the density or intensity of land use."[4] It contends that STRs are developments because they enable more people to reside at a residential property – per individual rental and cumulatively – and thereby intensify a residence's use.

Taken literally, CPA's argument would apply any time there is an increase in the number of occupants at a residence. Following this reasoning, if a couple sold their home to a family of four, that would intensify the use of the residence. So, too would a lease to a family of six, at a residence previously rented by a family of four. An intensification of use would also occur if the occupants of a residence had a baby, took in a house guest or hired a live-in nanny. Each event would "increase access to the

---

246–247 [holding that "clos[ing] the gate to Martins Beach Road, add[ing] a sign to the gate stating 'BEACH CLOSED KEEP OUT,' cover[ing] over another sign that had advertised public access, and station[ing] security guards to deny public access" was a " ' "change in the intensity of use of water or of access thereto" ' " and therefore a development]; *Gualala Festivals Committee v. California Coastal Com.* (2010) 183 Cal.App.4th 60, 68 [holding that a fireworks display fell within the definition of development as it applied to the " 'discharge . . . of *any* . . . gaseous . . . [or] solid . . . waste' "].)

[4]     CPA also alleges that STRs change the "intensity of use of water, or of access thereto." The arguments raised on appeal, however, are focused on changes to the density and intensity of use of land.

9

property, thereby resulting in a change in the density or intensity of land use." Even interpreting development broadly, this argument is untenable.

CPA counters that such "hypothetical absurdities" would likely be exempted or excepted from the Coastal Act. It cites, parenthetically, sections 30610 and 30624.7, asserting that those provisions are adequate to provide relief from a literal application of its argument. But neither section would apply in the manner CPA suggests. Section 30610 merely exempts specific projects from the definition of development, none of which are at issue here. And section 30624.7 provides a procedure by which a party can seek a CDP waiver for a proposed development subject to delays and contingencies that limit its utility in this context. It is neither reasonable nor practical to require homeowners to obtain a waiver any time there is a change in the number of occupants at their residence. Moreover, beyond identifying STRs as impermissible, CPA offers no principled basis for determining when an increase in residents would qualify for a waiver.

Furthermore, as Airbnb points out, CPA's interpretation of a "change in the density and intensity of use of land" is untethered to the land's existing use. CPA asserts that "any property used as an STR is a development" even if the residence is already used as an STR because it "provide[s] accommodations to guests who would not otherwise access the property." This interpretation goes well beyond the plain text of the statute, which on its face applies only when there is a "change" in density and intensity of the land's "use," not simply any time more (or different) people have access to the property. Rather, common sense tells us that residential properties have a "residential use." To determine whether an STR changes the "density or intensity

10

of use" of a residence, the appropriate starting point is whether using a residence as an STR is consistent with residential use.

Keen, supra, 77 Cal.App.5th 142, is instructive. In Keen the owner of an STR challenged the City of Manhattan Beach's interpretation of long-standing zoning ordinances pertaining to " 'Single Family Residential' " and " 'Multi-Family Residential' " residences. After historically allowing STRs, the city changed its interpretation of the ordinances to ban them. (*Id*. at pp. 146–147.) In rejecting the city's new interpretation, the court first examined whether the ordinances distinguished between short and long-term rentals. (*Id*. at pp. 148–149.) Finding no distinction, the court concluded "the law must treat long-term rentals the same as short-term rentals." (*Id*. at p. 148.) The court reasoned that "the word 'residence' does not imply some minimum length of occupancy. [Citation.] [¶] It is possible to reside somewhere for a night, a week, or a lifetime. The City points to no legally precedented way to draw a line between the number of days that makes some place a 'residence' and the number that shows it is not." (*Id*. at p. 149.)

Applying the reasoning in *Keen,* where a residential zoning code is silent regarding STRs, using a residence as an STR is a residential use, not a change in use, and thus not a development. At the same time, implicit in *Keen's* reasoning is that whether an STR is a permissible residential use depends on the applicable zoning for the specific property. If a city's zoning provides that STRs are not allowed, or distinguishes them from other residential uses, a different analysis might apply.

The significance of a locality's specific zoning requirements in determining whether STRs constitute residential use is confirmed by *Greenfield v. Mandalay Shores Community Assn*.

11

(2018) 21 Cal.App.5th 896 (*Greenfield*).  In *Greenfield*, an owner of an STR challenged a resolution by a homeowners association banning STRs.  The property at issue was in an area zoned for residential use pursuant to the City of Oxnard's LCP.  Although the zoning ordinance did not address STRs, the court noted that the city had "historically treated STRs as a residential activity," and that the city and the Coastal Commission had never interpreted the residential zoning ordinance to ban STRs." (*Id*. at pp. 899, 901, fn. 3.)  Accordingly, the court concluded that when the homeowners association banned STRs it change[d] the intensity of use and access to single-family residences in the Oxnard Coastal Zone" and concluded that the ban was a development under the Coastal Act.  (*Id*. at p. 901.)  Similarly, in *Kracke v. City of Santa Barbara* (2021) 63 Cal.App.5th 1089, 1097, the court held that the City of Santa Barbara's decision to regulate STRs as hotels was a development where the city's LCP did not address STRs and the city had historically treated them as "permissible residential uses." (*Id*. at p. 1092.)

CPA insists that a change in density and intensity does not turn on the land's existing use, pointing to the holding in *Pacific Palisades*.  There, our Supreme Court held that the conversion of a mobile home park from tenant occupied to resident owned constituted a development under the Coastal Act.  (*Pacific Palisades*, *supra*, 55 Cal.4th at p. 795.)  The court determined that the proposed mobile home conversion was a type of subdivision, and therefore expressly included in the definition of development, which includes a " 'change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act . . . , and other division of land including lot splits.' " (*Id*. at p. 794.)  The court held "each

listed project [included in the definition of development] *is* a change in the intensity of use for purposes of the act" (*id.* at p. 795), even when a "particular conversion will have no impact on the density or intensity of land use." (*Id.* at p. 797.) The court explained that even when "conversion might not immediately alter use of land [it] does not preclude the possibility it will lead to an increase in the density or intensity of use." By way of example, the court noted that future owners might among other things "block public access to coastal areas or increase the number of residents in their units." (*Ibid.*)

CPA seizes on this language, arguing that *Pacific Palisades* holds that any "increase in the number of residents" is a change in the density or intensity of use and therefore a development, regardless of how the property is being used. But the holding in *Pacific Palisades* is predicated on the existence of a "change" in use, which in that case was a mobile home park "conversion." We do not read *Pacific Palisades* to hold that any increase in the number of residents is a development unless accompanied by a contemporaneous change in the land use.[5]

---

[5] CPA also cites *Stanson v. San Diego Coast Regional Com.* (1980) 101 Cal.App.3d 38 (*Stanson*), for the proposition that "increases in intensity of use resulting from increased automobile and pedestrian traffic" constitutes development. (*Id.* at p. 47.) In *Stanson*, the property owner of a commercial building argued that the conversion of storage space into a restaurant was not a development because the remodel reduced the existing square footage. In rejecting that argument, the court held that the "Regional Commission properly looked beyond the mere reduction in floor space to the actual effect of intensified use which might be generated by Stanson's project." (*Ibid.*)

13

In short, we conclude that a development does not occur merely because a residence is used as an STR. Whether using a residence as an STR is a "change in the density or intensity of the use of land" and thus a development under the Coastal Act depends on the permissible scope of the residence's existing use. CPA's sweeping interpretation of development to include every STR would circumvent the specifically tailored zoning ordinances in the LCPs throughout the coastal zone. Interpreting the Coastal Act in this way is neither reasonable nor consistent with the Act's acknowledged reliance on "local government and local land use planning procedures and enforcement" in carrying out the Act's goals. (§ 30004, subd. (a).) Such an interpretation would also undermine the Coastal Act's goal of maximizing public access to the coast, by limiting the availability of STRs as affordable accommodations for short-term renters. (§ 30001.5.)[6]

---

Although not discussed explicitly in *Stanson*, the proposed remodel at issue in that case fell within "the Coastal Act's definition of the word 'development' [which] includes the 'construction, reconstruction' or 'demolition' of any structure." (*11 Lagunita, LLC v. California Coastal Com.* (2020) 58 Cal.App.5th 904, 927.) Accordingly, we do not construe *Stanson* to hold that any increase in foot or auto traffic is by itself a development.

[6] For the same reasons, CPA's effort to characterize STRs as commercial use is also unpersuasive. What qualifies as commercial use depends on how a locality has crafted its commercial zoning ordinance and cannot simply be reduced to whether the homeowner is earning money from renting the property or how many people occupy it. (*Greenfield, supra*, 21 Cal.App.5th at p. 901, fn. 3.)

14

We accordingly hold that CPA has failed to state a claim under the Coastal Act, and the trial court properly sustained the demurrer. Furthermore, because CPA does not assert how the complaint could be amended to state a claim, the trial court did not abuse its discretion in declining leave to amend.[7]

The parties also dispute whether and to what extent we can consider certain Coastal Commission materials.[8] Because we

---

[7] Because we reject the interpretation urged by CPA and hold that STRs in the coastal zone are not per se developments as defined in section 30106, we do not address its arguments that Airbnb is vicariously liable for the conduct of the homeowners that use its platform or that Airbnb is directly liable because it engaged in development by operating its platform to facilitate STRs in the coastal zone. We also do not address Airbnb's primary jurisdiction argument.

[8] The parties disagree as to whether various Coastal Commission actions and reports are judicially noticeable. There are two categories of Coastal Commission materials at issue in this case. The first are the Trinidad and Eureka Reports that the trial court judicially noticed and relied on in sustaining the demurrer. The second are other various Coastal Commission materials (e.g., staff reports, meeting agenda, videorecordings) relating to proposed LCP amendments addressing STRs for the cities of Trinidad, Eureka, Malibu and Santa Barbara of which the parties request this court take judicial notice on appeal. The parties do not request the court take judicial notice of the same materials, and CPA objects to Airbnb's request, although Airbnb essentially concedes to CPA's.

As to the first category, CPA maintains that the trial court abused its discretion when it took judicial notice of the Trinidad and Eureka Reports because they were irrelevant, and the court erroneously relied on "the truth of certain disputed statements in

15

conclude that the language of the statute is unambiguous and that a development does not occur every time a residence is used as an STR, we need not resolve the degree of deference owed to the Coastal Commission materials.

---

those reports." We disagree. The trial court in this case could properly take judicial notice of the Coastal Commission actions, which are " 'official acts of state agencies.' " (*Lent v. California Coastal Com*. (2021) 62 Cal.App.5th 812, 854.) CPA's contention that the trial court erred when it accepted as true a disputed fact as to whether STRs "constitute[ ] 'development' by increasing access to residential property and the coast" conflates an issue of statutory interpretation with a factual dispute. (For the same reason, we reject CPA's suggestion that its allegation that STRs are developments is a "well-pled" fact that we must accept as true for purposes of this appeal. (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6).) With respect to the remaining Coastal Commission materials, CPA argues that they concern the Coastal Commission's interpretation of "development," which is not entitled to deference and is accordingly irrelevant. We grant the request for judicial notice under Evidence Code section 452, subdivisions (c) and (h) but rely on them only to the extent they are relevant to our disposition of this appeal. We deny CPA's request for judicial notice of the trial court's July 2021 revised tentative ruling because it has no relevance on appeal. (*Gbur v. Cohen* (1979) 93 Cal.App.3d 296, 301.)

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.

## CERTIFIED FOR PUBLICATION

HEIDEL, J.*

We concur:

EDMON, P. J.

LAVIN, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.